PHYLLIS J. WEATHERMAN *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. GARY-WHEATON BANK OF FOX VALLEY, N.A., n/k/a The First National Bank of Chicago, N.A., *et al.*, Defendants-Appellants and Cross-Appellees.

First District (2nd Division) Nos. 1—95—3792, 1—95—4114 cons.

Opinion filed November 27, 1996.—Rehearings denied February 7, 1997 and July 18, 1997.

DIVITO, J., specially concurring in part and dissenting in part.

Lynn A. Goldstein and John C. Simons, both of Chicago, for appellants.

Krislov & Associates, Ltd., of Chicago (Clinton A. Krislov and Jonathan Nachsin, of counsel), for appellees.

JUSTICE SCARIANO delivered the opinion of the court:

In this appeal, we must determine whether, under the circumstances present in this case, the defendants' assessment of fees against plaintiffs for recording the assignment of a mortgage and for the suspension of an escrow violated the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1992)). For the reasons that follow, we conclude that the assessment for recording the assignment of the mortgage violated that act, while the charging of a fee for suspending the escrow payments was not a violation thereof.

Plaintiffs Phyllis J. Weatherman, Ruth A. Russell, and Roland D. Vega obtained a residential mortgage from Gary-Wheaton Bank of Fox Valley (Gary-Wheaton). After plaintiffs applied for their loan, the First National Bank of Chicago (First National), which is a subsidiary of First Chicago Corporation (First Chicago), acquired Gary-Wheaton. Plaintiffs filed a class-action complaint against First National and First Chicago, in which they alleged that these defendants had violated the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act; sometimes, Act) (815 ILCS 505/1 *et seq.* (West 1992)) by charging them a mortgage assignment recording fee and an escrow suspension fee at closing.

Defendants filed a motion to dismiss pursuant to section 2—619.1 of the Illinois Code of Civil Procedure (735 ILCS 5/2—619.1 (West 1992)). The circuit court dismissed First Chicago from the case and it also dismissed that portion of the complaint concerning the escrow

suspension fee, but it denied the motion with respect to the claim relating to the mortgage assignment recording fee. First National then filed a motion under section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619 (West 1992)) to dismiss the mortgage assignment recording fee claim. The court also denied this motion.

At First National's request, the circuit court then certified to this court the following question under Supreme Court Rule 308 (134 Ill. 2d R. 308):

"A. Whether a lender violates the Illinois Consumer Fraud and Deceptive [Business] Practices Act by giving an applicant for a loan, at the time a loan is applied for, a gross estimate of the recording fees to be paid at closing and not telling the loan applicant until closing that one of the fees included in the gross estimate was a fee to cover the cost of recording the assignment of the mortgage securing the loan.

B. In this case, the assignee of the assignment is a wholly-owned affiliate of the defendant."

The circuit court also found, under Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)), that there was no just reason to delay the appeal of its decision on the escrow suspension fee. It stayed further proceedings pending this court's decision on the certified question. We granted the appeal on the certified question and consolidated it with the plaintiffs' appeal under Rule 304(a).

In the appeal under Rule 308, First National argues that a mortgage assignment recording fee is proper under the circumstances stated in the certified question because (1) the Real Estate Settlement Procedures Act (12 U.S.C.A. § 2601 *et seq.* (West 1989)) provides a defense to a lender's liability under the Consumer Fraud Act; (2) it is not an unfair or deceptive practice under the Consumer Fraud Act for a lender to charge a borrower a mortgage assignment recording fee; (3) section 1735f—7(a)(1) of the Depository Institutions Deregulation and Monetary Control Act of 1980 (12 U.S.C.A. § 1735f—7(a)(1) (West 1989)) preempts the Consumer Fraud Act; and (4) the Illinois Interest Act (815 ILCS 205/1 *et seq.* (West 1992)) rather than the Consumer Fraud Act governs a lender's right to charge a borrower a mortgage assignment recording fee. In their appeal under Rule 304(a), plaintiffs argue that the circuit court erred in dismissing their claim relating to the escrow suspension fee because this fee violated the Consumer Fraud Act and because the court erroneously concluded that waiver and voluntary payment barred their action.

In their class-action complaint against First National and First Chicago, plaintiffs alleged that they applied to Gary-Wheaton for a mortgage to refinance their residential property. Plaintiffs signed a

loan commitment and gave Gary-Wheaton approximately $1,400 as a "lock-in fee," which was refundable if they closed on the loan. At some time prior to closing, Gary-Wheaton chose to assign plaintiffs' mortgage to Midwest Mortgages, Inc. (Midwest). Gary-Wheaton did not inform plaintiffs until closing that they would be required to pay a $15 fee for recording the assignment to Midwest. Midwest was an affiliate of First Chicago at the time Gary-Wheaton made the loan to plaintiffs.

Plaintiffs further alleged that Gary-Wheaton advised them that it would temporarily "suspend the escrow." "At a later date and after the loan had been approved, approximately three or four days before the January 12, 1993 closing," Gary-Wheaton demanded that plaintiffs pay a fee of $343.13 to "control their own escrow." Plaintiffs alleged that Gary-Wheaton told them that it would not complete the loan transaction if plaintiffs did not pay this fee. At closing, plaintiffs sent a letter to Gary-Wheaton, in which they disputed the escrow suspension fee and the mortgage assignment recording fee. They paid these fees, however, to avoid losing their lock-in fee.

Plaintiffs maintain that they received no benefit from the escrow suspension fee or the mortgage assignment recording fee. In addition, they alleged that if they had known before paying their lock-in fee that Gary-Wheaton would charge them these two fees, they "would have pursued refinancing with other lenders who did not require payment of these fees"; that Gary-Wheaton intended plaintiffs to rely on its omissions and misrepresentations, and that plaintiffs did rely on its omissions and misrepresentations.

Based on these allegations, plaintiffs claimed that First National and First Chicago had engaged in unauthorized and deceptive lending practices. They asserted that it was a violation of the Consumer Fraud Act to charge the mortgage assignment recording fee because the assignment was separate from the loan transaction. They asserted that it was a violation of the Act to charge the escrow suspension fee because Gary-Wheaton had waived its right to require an escrow. They also asserted that the timing of the disclosure of the fees violated the Act and that Gary-Wheaton misrepresented that the fees were required charges and were necessary for it to close and fund the loan.

Plaintiffs attached several documents to their complaint. One of these was the "Good Faith Estimate of Charges" that Gary-Wheaton provided them at the time they applied for the loan. This good-faith estimate consisted of a preprinted list of fees with boxes next to the listed items, in which an estimated amount could be written. In the box on the line for "recording fees," the amount $80 was written. In

spaces provided for "others," there was an estimate of $180 for nine months of insurance escrow and $333 for eight months of tax escrow, although, at some point, someone drew a line through the tax escrow estimate and initialled the change. At the bottom of the form, there was a printed disclaimer. Because of the poor quality of the copy in the record, only the words "you may be required to pay other additional amounts at settlement" are legible. The form was dated October 31, 1992, and signed by all three plaintiffs.

Plaintiffs also attached a document entitled "Initial Escrow Account Statement required by Section 10(c)(1) of the Real Estate Settlement Procedure Act (RESPA)." This document listed plaintiffs' names and stated that the terms of their loan required them to have an escrow account for taxes and insurance. Typed on the printed form, however, are the words "temporary suspension of escrows has been approved." The form is undated.

Another attachment was a copy of a loan disbursement statement, which showed a "temporary suspension of escrow fee" of .25% of the loan amount, or $343.13. Plaintiffs signed this statement, which is also undated.

A fourth document plaintiffs attached was a HUD-1 form, which listed plaintiffs' settlement costs at closing. This form, dated January 12, 1993, the date of closing, listed the $343.13 fee as a "temporary suspension of escrows." Recording fees were listed in preprinted categories as follows: $30 for the deed, $17 for the mortgage, and $15 for releases. On a blank line below these recording fees the words "assignment of mortgage" were typed next to the amount of $15. The last attachment to the complaint was the *letter, dated January 12, 1993, in which plaintiffs disputed the fees.*

Defendants filed a motion to dismiss "pursuant to 735 ILCS 5/2—619.1, for failure to state a claim upon which relief may be granted." To their motion to dismiss, they attached a copy of the Illinois Mortgage Escrow Account Act (765 ILCS 910/1 *et seq.* (West 1992)) (Escrow Act) that plaintiffs had signed on January 12, 1993.

In March 1994, the circuit court dismissed First Chicago without prejudice, and, thereafter, First National filed a memorandum to support its motion to dismiss. Among the attachments to the memorandum was a document, entitled "Important Information for Borrowers," which informed borrowers that their loan would "be sold and transferred at or after closing." Plaintiffs signed this document on October 31, 1992.

First National attached plaintiffs' responses to requests to admit to its reply to plaintiffs' response to its motion to dismiss. In these responses, plaintiffs admitted that they had asked Gary-Wheaton to

suspend the escrow requirement after they applied for the loan and after they had paid the lock-in fee. They also admitted that Gary-Wheaton had refunded their $275 mortgage application fee, but they asserted that this was because of errors in the closing documents.

On September 1, 1994, the circuit court denied the motion to dismiss with respect to the mortgage assignment recording fee but granted it with respect to the escrow suspension fee. The court granted the motion with respect to the escrow suspension fee because it concluded that plaintiffs had received advance notice of the charge and had agreed to it in advance. The court did not specify under which Code section it decided First National's motion.

One month after the court denied its motion to dismiss with respect to the $15 mortgage assignment recording fee, First National filed another motion to dismiss plaintiffs' claim with respect to this fee. First National specified that this second motion to dismiss was pursuant to section 2—619.

In connection with its second motion to dismiss, First National filed the affidavit of Leonard Giblin, president of Midwest. In his affidavit, Giblin asserted that Midwest bought "mortgages from lenders and [sold] them in the secondary mortgage market, predominantly to such quasi-governmental agencies as the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Home Mortgage Corporation (Freddie Mac)." Due to the volume of mortgages it sold in the secondary market, Midwest was able to get better prices from Fannie Mae and Freddie Mac for its mortgages than smaller-volume mortgage sellers.

Giblin's affidavit also states that as a result of an agreement under which Midwest promised to purchase mortgage loans from Gary-Wheaton, the bank was able to offer home mortgage loans with an annual percentage rate .05% lower than it would otherwise have been able to offer. Giblin went on to state that "[t]he $15 mortgage assignment fee charged to mortgagors to assign their mortgages from Gary-Wheaton to [Midwest] is paid directly to the title company which closes the mortgage loan and not to Midwest or Gary-Wheaton."

Plaintiffs attached Giblin's deposition to their surreply. He testified therein that a bank that sells a mortgage to Midwest bears the cost of the "mortgage assignment recording fee, which the bank may collect at closing even though it assigns the mortgage after closing. And then how they pay for it is not part of your deal with them," acknowledging that the lender instructs the closing agent to "charge the borrower or charge us or charge whoever will pay it, because those instruction[s] do come from the lender." Giblin further deposed

that Midwest prepared the bank's preliminary truth-in-lending statement "where we estimated the recording costs large enough to include the assignment." Midwest acted as a broker, did not have assets to invest in mortgages, and always bought mortgages for an investor.

On July 13, 1995, the circuit court denied First National's second motion to dismiss, and it refused plaintiffs' request to decide the issue of class certification at that time. As previously stated, the circuit court then certified a question under Rule 308 concerning the mortgage assignment recording fee and found, pursuant to Rule 304(a), that there was no just reason to delay an appeal involving its dismissal of plaintiffs' claim concerning the escrow suspension fee.

■ As a preliminary matter, we deny plaintiffs' request that we strike portions of First National's brief because First National's arguments go beyond the certified question. Although it is true that an appellate court should not expand on a certified question to answer questions that could have been included but were not (*McCarthy v. La Salle National Bank & Trust Co.*, 230 Ill. App. 3d 628, 631, 595 N.E.2d 149 (1992)), it may answer questions that are necessarily a part of the certified question (see *Gordon v. Boden*, 224 Ill. App. 3d 195, 198-99, 586 N.E.2d 461 (1991)). We find that First National's arguments concerning federal law and the Illinois Interest Act are relevant to the application of the Consumer Fraud Act and are, therefore, relevant to the certified question.

First National argues that charging a mortgage assignment recording fee under the circumstances in the certified question does not violate the Consumer Fraud Act because the fee is disclosed in compliance with the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C.A. § 2601 *et seq.* (West 1989)). First National relies on section 10b(1) of the Consumer Fraud Act, which provides:

"Nothing in this Act shall apply to:

(1) Actions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 ILCS 505/10b(1) (West 1992).

According to First National, providing a loan applicant with a gross estimate of recording fees is in accordance with RESPA, which does not require a lender, at the time of a loan application, to itemize recording fees. Instead, the sample good-faith estimate form provided in RESPA regulations "requir[es] all recording fees to be lumped together."

Yet, the stated purpose of RESPA is to provide "more effective *advance disclosure* to home buyers and sellers of settlement costs."

(Emphasis added.) 12 U.S.C.A. § 2601(b)(1) (West 1989). To effectuate this goal, RESPA provides that the Secretary of Housing and Urban Development "shall develop and prescribe a standard form for the statement of settlement costs which shall be used \*\*\* as the standard real estate settlement form in all transactions in the United States which involve federally related mortgage loans." 12 U.S.C.A. § 2603(a) (West 1989). This statement is called a HUD-1 or HUD-1A settlement statement. 24 C.F.R. § 3500.2(b)(2) (1996).

In this connection, section 5 of RESPA requires lenders to provide borrowers with a *good-faith* estimate of the amount of settlement charges a borrower is likely to incur. 12 U.S.C.A. § 2604(a),(c) (West 1989). We fail to discern any demonstration of good faith on the part of a lender, who, well in advance of closing, intends to assign plaintiffs' mortgage to its affiliate, created for that very purpose, and chooses not, in the language of RESPA, to provide "more effective *advance disclosure* to *home buyers* and sellers of settlement costs" until the parties come together at the closing of the transaction. (Emphasis added.) 12 U.S.C.A. § 2601(b)(1) (West 1989). We take "settlement costs" to mean *all* such costs without the convenience to the lender of amorphously lumping together costs that occur to the two parties to the loan and those relating only to the lender and a third party. We note that Mr. Giblin, the principal owner and president of the assignee, Midwest, deposed that Midwest typically prepared the bank's truth-in-lending statements, including the one in this case, in which "we estimated the recording costs large enough to include the assignment." It is not difficult to assess the value of such a stratagem: If disclosure of an alien cost is not required for any reason at all, why disclose it at all, and then why at the 11th hour when the parties are in the midst of closing? Would that be a propitious time to let a $15 difference "blow" a six-figure transaction that took time, effort and expense to put together? Plaintiffs' contention that they would have lost their lock-in fee in such an event remains unchallenged in this proceeding.

RESPA further authorizes the Secretary to prescribe rules and regulations to achieve the purposes of the Act. 12 U.S.C.A. § 2617 (West 1989). In one of these regulations, the Secretary explains that the good-faith estimate of charges the lender must provide should contain a good-faith estimate of the amount of "each charge" that will be listed as a settlement charge on the HUD-1 form, and if there are other charges that are not listed on this form but which the borrower would pay at or before settlement based upon common practice in the locality of the mortgaged property, these should also be estimated at the time of the loan application. 24 C.F.R. § 3500.7(c)

(1996). The HUD-1 form, which is contained in appendix A of the regulations, has a line for recording charges, and the instructions to the form tell the preparer of this form to itemize recording fees. 24 C.F.R. § 3500, app. A (1996).

Appendix C of the RESPA regulations contains a suggested good-faith estimate form, which the regulations state is in compliance with RESPA. 24 C.F.R. § 3500.7(d) (1996). This form contains one space for recording fees and has a space at the bottom to list "other" fees. 24 C.F.R. § 3500, app. C (1996). At the top of the form is the following disclaimer:

"The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates—the actual charges may be more or less. ***

*** The HUD-1 or HUD-1A settlement statement will show you the actual cost for items paid at settlement." 24 C.F.R. § 3500, app. C (1996).

The regulations permit the lender to include additional information in the good-faith estimate as long as the form remains clear and concise and the additional information is not more prominent than the required information. 24 C.F.R. § 3500.7(d) (1996).

█ We conclude that, based upon the regulations and the circumstances of this case, RESPA does not authorize a lender to give a gross estimate for recording fees without itemization. To begin with, the element of good faith, as we have already noted, is totally lacking on the part of defendants. In addition, the Secretary's regulations, 24 C.F.R. § 3500.7(c) (1996), as noted above, require that if there are other charges that are not listed on the HUD-1 form but which the borrower would pay at or before settlement based upon common practice in the locality of the mortgaged property, these should also be estimated at the time of the loan application. 24 C.F.R. § 3500.7(c) (1996). Here, Mr. Giblin, president of Midwest, deposed, as previously indicated, that a bank that sells a mortgage to Midwest bears the cost of the mortgage assignment recording fee. This evidence not only testifies to the local practice, but it would appear also to be un-assailably logical inasmuch as the assignment of a mortgage is a transaction as to which the borrower is completely passive, indeed a stranger. Accordingly, the disputed fee, being one that the borrower would not pay at or before settlement based upon common practice in the locality of the mortgaged property, is one that cannot be included in the estimate.

Moreover, we fail to be persuaded by the argument that by limiting the information which a lender may include in the good-faith

estimate, the regulations express a concern that the good-faith estimate remain clear and concise. Our review of the regulations invoked by the defendants leads irresistibly to the conclusion that, on the contrary, clarity and conciseness are promoted by detailing, rather than withholding, the information borrowers need in order to understand precisely what they are being charged for.

It is noteworthy that although plaintiffs here were informed more than two months before closing that their loan would "be sold and transferred at or after closing," they were not informed that the cost of recording that transfer would be charged to them. Moreover, as we have indicated above, recording fees were listed in the HUD-1 form in *preprinted* categories as $30 for the deed, $17 for the mortgage, and $15 for releases. Yet, on a blank line provided immediately below these recording fees, the words "assignment of mortgage" were typed next to the amount of $15, further evidence that the fee for recording an assignment of a mortgage is not one that a borrower would pay at or before closing based upon common practice in the locality of the mortgaged property, or the nature of the charge would be printed as were the other recording fees traditionally borne by the borrower. Furthermore, Giblin's testimony that the borrower or the lender "or whoever will pay it" is charged the assignment recording fee attests to the fact that charging the borrower is not the "common practice in the locality of the mortgaged property." Indeed, the only reference he makes to custom is that the lender pays the fee.

What defendants opt for merely facilitates the lender's passing on to its clients those charges that are, according to Giblin's testimony, customarily those of the lender, a most disingenuous contrivance to saddle a consumer with costs for a transaction totally foreign to him, and one of which he would have no formal knowledge except to be notified of the assignment after closing, and which does not educate him in any way as to the recording thereof and who pays for it. And even then such formal notice would be solely for the purpose of ensuring that the borrower makes his mortgage payments to the proper holder of the mortgage obligation.

Given that RESPA does not authorize, under the facts in this case, a gross estimate of recording fees, it fails to constitute a defense to liability under section 10b of the Consumer Fraud Act.[1] Analogous cases under the Federal Truth in Lending Act (15 U.S.C. §§ 1601

---

[1]The dissent cites *Lanier v. Associates Finance, Inc.*, 114 Ill. 2d 1, 499 N.E.2d 440 (1986), as a basis for the assertion that Gary-Wheaton's alleged compliance with RESPA constitutes a defense to liability under the Consumer Fraud Act. We believe *Lanier* is distinguishable: in *Lanier*, compli-

through 1665 (1982)) which support a finding that RESPA compliance is a defense to liability under the Consumer Fraud Act are therefore inapposite here.

■ Section 2 of the Consumer Fraud Act provides:

"Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', *** in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2 (West 1992).

To establish a deceptive practice claim under the Consumer Fraud Act, a plaintiff must allege (1) the misrepresentation or concealment of a material fact, (2) the defendant's intent that the plaintiff rely on the misrepresentation or concealment, and (3) the occurrence of the deception in the course of trade or commerce. *Dwyer v. American Express Co.*, 273 Ill. App. 3d 742, 749, 652 N.E.2d 1351 (1995).

First National contends that there was no misrepresentation in connection with the fee, and no statute or regulation prohibited it from charging the fee. Plaintiffs assert that it was unfair and deceptive for Gary-Wheaton to "spring" an unpermitted fee at closing as a requirement for closing and to force plaintiffs to either pay this fee or lose thousands of dollars.

■ We cannot agree with First National that the circumstances stated in the certified question show no misrepresentation or that they do not demonstrate concealment of a material fact. To show concealment of a material fact under the Consumer Fraud Act, a plaintiff must prove that the defendant stayed silent in circumstances under which it had a duty to speak. *Mackinac v. Arcadia National Life Insurance Co.*, 271 Ill. App. 3d 138, 143, 648 N.E.2d 237 (1995). We have already indicated that a lender has a duty to itemize the fees included in its gross estimate of recording fees at the time of a loan application.

---

ance with the Truth in Lending Act would have resulted in common law misrepresentation (and liability under the Consumer Fraud Act) (114 Ill. 2d at 10-11). Here, by contrast, compliance with the Consumer Fraud Act would not be a violation of RESPA, as we have noted above.

Moreover, we cannot agree that defendant should be excused from disclosing a $15 mortgage assignment recording fee on the ground that it would result in "informational overload" (286 Ill. App. 3d at 67-68).

We therefore remain convinced that a gross estimate of recording fees in this case "conceals" the identity of a fee that has no relationship to the person charged therefor, thus deceiving the borrower into believing that the good-faith estimate contains an exact description of all fees the borrower will be required to pay at closing. We believe that we have made it clear that the requirement of a good-faith estimate refers to charges that the borrower has a right to believe are his and that he is not being required to assume a cost that is not his to bear. Nor can it be successfully contended that plaintiffs agreed to bear it or that it was within the contemplation of the parties that they pay it.

■ We do not purchase the argument that there is absent in this case any deceptive practice under the Consumer Fraud Act under the circumstances stated in the certified question because there was no misrepresentation or concealment. Plaintiffs argue, correctly, we believe, not only that defendants were guilty of deception, but also that assessing them a fee that was not theirs to pay was unfair under the Consumer Fraud Act. Even if a practice is not deceptive under the Consumer Fraud Act, it may nevertheless be unfair. *People ex rel. Hartigan v. Knecht Services, Inc.*, 216 Ill. App. 3d 843, 853, 575 N.E.2d 1378 (1991). Whether a practice is unfair depends on a case-by-case analysis. *People ex rel. Fahner v. Testa*, 112 Ill. App. 3d 834, 837, 445 N.E.2d 1249 (1983). Section 2 of the Consumer Fraud Act directs courts to consider interpretations of section 5(a) of the Federal Trade Commission Act in construing Illinois law. 815 ILCS 505/2 (West 1992). In interpreting the federal act, the United States Supreme Court has indicated that courts should consider the following factors in evaluating whether a practice is unfair:

" '(1) whether *** it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' " *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244-45 n.5, 31 L. Ed. 2d 170, 179 n.5, 92 S. Ct. 898, 905 n.5 (1972), quoting 29 Fed. Reg. 8355 (1964).

■ We hold that the circumstances we encounter in this case establish the commission of an unfair practice under the Consumer Fraud Act. Plaintiffs maintain that it is unfair for a lender to burden a borrower with a mortgage assignment recording fee because the assignment is a transaction that is not part of the loan transaction. We agree. When a lender assigns a borrower's loan, the recording fee it incurs in assigning the mortgage is borne by the lender, as Mr. Giblin testified. Indeed, Mr. Giblin refers to it almost invariably throughout his deposition as an "assignment fee."

The court's holding in *Butitta v. First Mortgage Corp.*, 218 Ill. App. 3d 12, 578 N.E.2d 116 (1991), does not command a different result. In *Butitta*, the court held that the plaintiffs' complaint against a lender for a Consumer Fraud Act violation failed to state a cause of action. The plaintiffs had sold their home to a buyer who had obtained a mortgage insured by the Federal Housing Authority (FHA). Because the FHA prohibited the lender from charging the borrower a mortgage assignment recording fee, the lender charged the sellers this fee, but it did not inform the sellers of the fee until closing. *Butitta*, 218 Ill. App. 3d at 14.

The *Butitta* court held that these allegations were insufficient to show a violation of the Consumer Fraud Act because the lender made no misrepresentation, and the plaintiffs failed to show that the fee was material or illegal. *Butitta*, 218 Ill. App. 3d at 19-20. The court faulted the plaintiffs for their failure to "allege that had they known about the charges, they would have pursued buyers who did not require FHA or VA loans. The allegation of how one would have acted differently may be raised to support an inference of materiality. [Citation.] However, the absence of such an allegation may suggest a lack of materiality." *Butitta*, 218 Ill. App. 3d at 19. In the case at bar, plaintiffs allege that they protested the charge at closing, while in *Butitta*, "[t]here are not even any allegations that the [plaintiffs] questioned these charges at the time of closing." *Butitta*, 218 Ill. App. 3d at 18. Moreover, in the case *sub judice*, plaintiffs, unlike those in *Butitta*, alleged that had they known before they had paid any money to the lender that it would charge them disputed fees in this case, they "would have pursued refinancing with other lenders who did not require payment of these fees." Indeed, all of the allegations the *Butitta* court found lacking are stated more than adequately in the case at bar. We therefore hold that plaintiffs state a cause of action under the Consumer Fraud Act.

It is also important to note, as we have discussed above, that section 2 of the Consumer Fraud Act outlaws "unfair or deceptive acts or practices *** whether any person has been misled, deceived or damaged thereby." 815 ILCS 505/2 (West 1992). *People ex rel. Hartigan v. Knecht Services, Inc.*, 216 Ill. App. 3d 843, 575 N.E.2d 1378. And whether a practice is unfair depends on a case-by-case analysis. *People ex rel. Fahner v. Testa*, 112 Ill. App. 3d 834, 445 N.E.2d 1249. It also bears repeating that section 2 of the Consumer Fraud Act directs courts to consider interpretations of section 5(a) of the Federal Trade Commission Act in construing Illinois law. 815 ILCS 505/2 (West 1992). In interpreting the federal act, the United States Supreme Court has indicated that courts should consider the following factors in evaluating whether a practice is unfair:

" '(1) whether *** it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' " *Federal Trade Commission v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244-45 n.5, 31 L. Ed. 2d 170, 179 n.5, 92 S. Ct. 898, 905 n.5 (1972), quoting 29 Fed. Reg. 8355 (1964).

This discussion of what we consider to be the exceedingly important factor of unfairness is notably absent in *Butitta*, presumably because it was not raised by the plaintiffs there. We nevertheless reiterate our holding that the circumstances we encounter in this case establish defendants' commission of an unfair practice under the Consumer Fraud Act, for we have not the organs to perceive the propriety of passing on to an unknowing borrower a fee for a transaction of which he is entirely oblivious until he becomes, conveniently, a captive at closing and his loan is held hostage to the disingenuousness of the lender. To uphold such a practice as a "right" of the lender would permit the bank in this case to charge the borrower for a multiplicity of items, *e.g.*, the subsequent recording of the assignments Midwest makes of the mortgages it peddles to Fannie Mae and Freddie Mac; all we need to do is to adopt the same justification and logic employed by defendants herein. The fact that the lender felt it necessary to disclose the charge, but only at a time that put the borrower at risk, if he protested payment, of breaching his contract with the seller of the property and forfeiting his not inconsiderable lock-in fee, leads one inevitably to conclude, without any tedious cerebration, that disclosure at a more reasonable time during the several weeks' life of the transaction would not have worked to the advantage of the defendants in this case. We note that the trial court denied defendants' motion as to the recording fee for the reason that they had not given plaintiffs' advance notice of the charge, while granting the motion as to the issue of the escrow because that fee did not suffer from the same infirmity.

After reviewing the defendants' arguments regarding the application of section 1735f—7(a)(1) of the Depository Institutions Deregulation and Monetary Control Act of 1980 or the application of the Illinois Interest Act to the issue of the recording fee, we determine them to be without merit. Accordingly, we answer the certified question in the affirmative.

■ We now turn to plaintiffs' cross-appeal of the court's dismissal of their escrow suspension fee claim. The circuit court did not identify under which Code section it decided the motion to dismiss this claim,

and First National failed to specify under which section of the Code of Civil Procedure it brought this motion, as section 2—619.1 requires. Although "hybrid" motions to dismiss are improper, a reviewing court will review a dismissal under such a motion if to do so would serve the interests of judicial economy and if the nonmoving party was not prejudiced. See *Talbert v. Home Savings Bank of America*, 265 Ill. App. 3d 376, 379, 638 N.E.2d 354 (1994).

Plaintiffs were not prejudiced by the court's consideration of this motion despite its improper form. The record indicates that, notwithstanding the attachments to its motion, First National intended to bring the motion under section 2—615, and plaintiffs responded to it as if it were brought under that section. First National stated in the motion that it was based on plaintiffs' failure to "state a claim on which relief could be granted," and it stated in its second motion to dismiss that the circuit court had decided the first motion pursuant to section 2—615. Likewise, plaintiffs took the position in the circuit court and do the same on appeal that First National's motion is governed by section 2—615. We therefore review the motion as if it were properly filed under section 2—615.

■ A reviewing court applies a *de novo* standard of review to motions to dismiss under section 2—615. *Metrick v. Chatz*, 266 Ill. App. 3d 649, 652, 639 N.E.2d 198 (1994). In reviewing a dismissal for failure to state a claim on which relief may be granted, the only issue before the appellate court is whether the dismissed counts state a cause of action. *Majumdar v. Lurie*, 274 Ill. App. 3d 267, 268, 653 N.E.2d 915 (1995). The court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Smith v. City of Chicago*, 253 Ill. App. 3d 54, 56, 625 N.E.2d 300 (1993).

Plaintiffs argue that it was a violation of the Consumer Fraud Act for Gary-Wheaton to charge an escrow suspension fee because (1) the Escrow Act does not permit a lender to charge a fee in lieu of an escrow account and (2) Gary-Wheaton failed to disclose the fee until a few days before closing.

■ Under the recent decision in *Stern v. Norwest Mortgage, Inc.*, 284 Ill. App. 3d 506 (1996), we hold that the escrow suspension fee did not violate the Consumer Fraud Act. In *Stern*, the court held that an "escrow waiver fee" a lender charged did not violate the Consumer Fraud Act. Under the Illinois Mortgage Escrow Account Act (Escrow Act) (765 ILCS 910/1 *et seq.* (West 1992)), the borrowers in *Stern* had chosen to pledge an interest-bearing time deposit rather than establish an escrow account. The lender charged the borrowers a fee equal to .25% of the loan principal in permitting them to exercise this option. The borrowers sued the lender on the ground that the fee

violated the Escrow Act and the Consumer Fraud Act. *Stern*, 284 Ill. App. 3d at 508.

The *Stern* court held that the fee did violate the Escrow Act but did not violate the Consumer Fraud Act. The court explained that the parties had had a legitimate disagreement about the implications of the Escrow Act and, although the lender erroneously concluded that this statute did not prohibit its fee, this error did not amount to a violation of the Consumer Fraud Act because the Consumer Fraud Act prohibits deception, not error. *Stern*, 284 Ill. App. 3d at 513.[2]

*Stern* supports a conclusion in this case that Gary-Wheaton did not violate the Consumer Fraud Act by charging an escrow suspension fee. As in *Stern*, the parties in this case have a legitimate disagreement as to whether the Escrow Act permits an escrow suspension fee. Assuming Gary-Wheaton was incorrect in its interpretation of the Escrow Act, as the lender was in *Stern*, this would not prove a violation of the Consumer Fraud Act.

Moreover, we believe that the Escrow Act does not prohibit a fee such as the one Gary-Wheaton charged in this case. This statute governs a borrower's options in the event that a lender requires an escrow account and allows a borrower to pledge a time deposit in lieu of establishing the escrow. The statute does not address the situation in which a lender waives the escrow requirement. The Escrow Act does not, therefore, prevent a lender from charging a fee for waiving its right to require an escrow. The *Stern* decision does not, therefore, require us to find that the escrow suspension fee violated the Escrow Act. While the fee in *Stern* related to a matter covered by the Escrow Act, *viz.*, the option of pledging a time deposit, the fee in this case involved an option not addressed by the Escrow Act.

---

[2]The dissent suggests that this same result should obtain regarding the recording fee. We cannot agree. The *Stern* court expressly stated "we cannot say that [defendant's] position is the result of any 'unfair or deceptive acts or practices' nor can the acts of defendant be characterized as 'fraud, false pretense, false promise' or concealment of any material fact." 284 Ill. App. 3d at 512. In that case, the lender informed the borrower of the fee and the borrower elected among his options. Here, by contrast, there *was* concealment of a fact, and Gary-Wheaton's course of conduct amply demonstrates that it was designed to delay disclosure until borrowers were virtually powerless to take any action: closing. If this were, as in *Stern*, an honest dispute on statutory construction, then, as in *Stern*, it would be disclosed early, rather than late.

We also disagree with plaintiffs that the timing of Gary-Wheaton's disclosure of the escrow suspension fee violated the Consumer Fraud Act. It was not unfair or deceptive for Gary-Wheaton not to disclose the escrow suspension fee until after plaintiffs had paid their lock-in fee because, as the complaint shows, plaintiffs did not request an escrow waiver until after this time. The good-faith estimate they received demonstrated that the parties originally contemplated an escrow arrangement. The allegations of the complaint also indicate that the parties did not discuss suspension of the escrow requirement until after the loan had been approved and plaintiffs had paid the lock-in fee.

Although plaintiffs claim that they were forced to pay the escrow suspension fee because they would otherwise have lost their lock-in fee, this is not true. As First National argues, they could have avoided forfeiting their lock-in fee and paying the escrow suspension fee if they had adhered to the parties' original arrangement, under which Gary-Wheaton required an escrow account. There was no unfairness or deception in Gary-Wheaton charging plaintiffs a fee to deviate from the original arrangement. Given that they knew of the escrow suspension fee several days before closing, plaintiffs had time to decide whether to adhere to the original arrangement, pay the escrow suspension fee, or forfeit their lock-in fee and seek another lender.

Plaintiffs also alleged that Gary-Wheaton misrepresented that the escrow suspension fee was required and necessary. As First National argues, it was not a misrepresentation for Gary-Wheaton to assert that the fee was required because Gary-Wheaton would have refused to close on the loan without an escrow account if plaintiffs had not paid this fee.

The circuit court, therefore, properly dismissed plaintiffs' claim relating to the escrow suspension fee because the complaint stated no violation of the Consumer Fraud Act.

Plaintiffs also assert that this court must reverse the circuit court's ruling because it improperly relied on defenses of voluntary payment or waiver, which First National did not plead, but the record does not support their claim that the court relied on these defenses. Moreover, this court may uphold the circuit court's dismissal on any basis in the record. See *Home Indemnity Co. v. General Accident Insurance Co. of America*, 213 Ill. App. 3d 319, 321, 572 N.E.2d 962 (1991).

We answer the certified question in the affirmative and affirm

the circuit court's judgment dismissing plaintiffs' escrow suspension fee claim.

No. 1—95—3792—Certified question answered in the affirmative.
No. 1—95—4114—Affirmed.

BURKE, J., concurs.

JUSTICE DiVITO specially concurring in part and dissenting in part:

Although I agree with the majority's decision regarding the escrow suspension fee, I respectfully dissent from its answer to the certified question. The disclosure of the mortgage assignment recording fee, in the circumstances described in the certified question, was in compliance with RESPA.

The majority states that RESPA requires advance disclosure of *all* settlement costs. I agree that RESPA requires the disclosure of all settlement costs on the HUD-1 form, but I disagree that RESPA requires the same detailed disclosure on the good-faith estimate form. To the contrary, the regulations authorize and encourage a disclosure such as the one that occurred in this case.

The sample good-faith estimate form and HUD-1 form contained in the regulations present the strongest evidence that RESPA authorizes a lender to provide a borrower with a gross estimate of recording fees at the time of loan application. Although the HUD-1 form has spaces for a lender to identify the amounts of specific recording fees, such as fees for recording the mortgage and releases, the good-faith estimate form contains only a single space for a lender to estimate recording fees. Based on this form, which the Secretary provided to assist lenders in complying with RESPA, it is reasonable to conclude that, by placing a gross estimate for recording fees in the single space the form contains, a lender complies with RESPA. Although the sample good-faith estimate form contains spaces for "other" fees, these spaces cannot have been intended for recording fees because the word "other" indicates fees in categories other than those listed on the form, and "recording fees" is listed.

Although the majority states that the purpose of RESPA is served by detailing each settlement cost a borrower will pay at closing, this is contradicted by the regulation that prohibits lenders from adding information to the good-faith estimate in order to preserve the clarity and conciseness of this form. The fact that, unlike the HUD-1 form, the good-faith estimate form contains only one space for informing borrowers of recording fees also shows that the good-faith estimate is not intended to contain detailed information.

Moreover, the stated purpose of RESPA is not just to provide advance disclosure, it is to provide "effective advance disclosure." A gross estimate of recording fees provides effective advance disclosure because it allows borrowers to compare the recording fees of one lender to those of another, while maintaining the clarity and conciseness of the good-faith estimate form.

I also disagree with the majority's assertion that the lender in this case did not act with good faith. Given the single space for recording fees on the good-faith estimate form the Secretary provided, it would not be unreasonable for a lender completing this form to conclude that it should include all recording fees in that single space. Significantly, the lender in this case did not omit the mortgage assignment fee from its estimate. The fee was included in the $80 it estimated for recording fees and, in fact, the borrower had to pay $77, which was $3 *less* than the amount contained in the estimate.

The majority also asserts that the lender did not act in good faith because it did not provide more effective advance disclosure of the mortgage assignment recording fee to plaintiffs even though, well in advance of closing, it intended to assign plaintiffs' mortgage to "its affiliate, created for that very purpose." 286 Ill. App. 3d at 56. Although the record supports a conclusion that Gary-Wheaton intended, in advance of closing, to assign plaintiffs' mortgage, there is no support for the majority's assertion that it intended to assign the mortgage to an affiliate that was created for this purpose. Instead, the record indicates that Midwest and Gary-Wheaton did not become affiliates until after plaintiffs' loan transaction, and Midwest's creation was independent of its later relationship with Gary-Wheaton.

Given that RESPA authorizes a gross estimate of recording fees, it constitutes a defense to liability under the Consumer Fraud Act pursuant to section 10b of that act. Analogous cases under the Federal Truth in Lending Act (15 U.S.C. §§ 1601 through 1665 (1982)) support a finding that RESPA compliance is a defense to liability under the Consumer Fraud Act. For example, in *Lanier v. Associates Finance, Inc.*, 114 Ill. 2d 1, 499 N.E.2d 440 (1986), our supreme court held that a lender's disclosure to a borrower did not violate the Consumer Fraud Act because it was in compliance with the Truth in Lending Act. The loan agreement provided that, in the event of prepayment, the borrower could receive a refund of any unearned finance charge, and the lender would compute the refund according to the "Rule of 78's." The borrower complained that the lender had an obligation to explain the Rule of 78's at the time of the loan. *Lanier*, 114 Ill. 2d at 12.

The supreme court concluded that the Federal Reserve Board had balanced the need to avoid confusion with the need to avoid in-

formational overload and had concluded that reference by name to the Rule of 78's was sufficient to inform the borrower of the method for computing the unearned finance charge. *Lanier*, 114 Ill. 2d at 12. The court held that, because the lender's disclosure complied with federal regulations, it was exempt from liability under section 10b(1) of the Consumer Fraud Act. *Lanier*, 114 Ill. 2d at 17-18. The court explained that to hold otherwise would place a lender in the anomalous position of being guilty of common law misrepresentation by specifically complying with the Truth in Lending Act. *Lanier*, 114 Ill. 2d at 10-11. The *Lanier* court also based its holding on its perception that disclosure provisions of Illinois consumer credit statutes showed a consistent policy against extending disclosure requirements beyond those required by the Truth in Lending Act. *Lanier*, 114 Ill. 2d at 17.

Given that a gross estimate of recording fees is authorized by RESPA, under *Lanier*, a lender does not violate the Consumer Fraud Act in the circumstances stated in the certified question. See also *Shields v. Lefta, Inc.*, 888 F. Supp. 894, 898 (N.D. Ill. 1995) (creditor's compliance with Truth in Lending Act is a defense to liability under the Consumer Fraud Act); *Price v. FCC National Bank*, 285 Ill. App. 3d 661 (1996) (compliance with the Truth in Lending Act is compliance with the Illinois Credit Card Issuance Act (815 ILCS 140/6 (West 1994))); *Aurora Firefighter's Credit Union v. Harvey*, 163 Ill. App. 3d 915, 923, 516 N.E.2d 1028 (1987) (there was no violation of the Consumer Fraud Act because the credit union's disclosure complied with the Truth in Lending Act).

As I have explained, I believe the lender complied with RESPA in this case. Even assuming, however, as the majority argues, that the disclosure was in violation of RESPA, there would be no violation of the Consumer Fraud Act. At least two courts have recently held that a party does not violate the Consumer Fraud Act by performing an act that is based on an erroneous interpretation of a statute. See *Lee v. Nationwide Cassel*, 174 Ill. 2d 540 (1996) (the defendant did not violate the Consumer Fraud Act by attempting to hold the plaintiffs primarily liable under an installment contract for a car because, although the Motor Vehicle Retail Installment Sales Act prohibited such liability, this law was uncertain, and the defendant's actions were based on an erroneous interpretation of the law); *Stern v. Norwest Mortgage, Inc.*, 284 Ill. App. 3d 506 (a lender did not violate the Consumer Fraud Act by charging borrowers a fee for pledging a time deposit because it did so based on an erroneous interpretation of the Mortgage Escrow Account Act). In this case, therefore, even if the lender acted on the mistaken belief that RESPA authorized the disclosure it made, there would be no Consumer Fraud Act violation.

I note that the majority's opinion is somewhat inconsistent in its application of the *Stern* holding. Although the majority cites *Stern* for the proposition that a lender does not violate the Consumer Fraud Act by acting on an erroneous interpretation of the Mortgage Escrow Account Act, it holds the lender liable under the Consumer Fraud Act for an erroneous interpretation of RESPA.

RESPA compliance aside, I disagree with the other bases for the majority's finding of a Consumer Fraud Act violation in this case. The majority argues that it is deceptive and unfair for a lender to charge a mortgage assignment recording fee under the circumstances in this case because the lender and not the borrower is responsible for paying the fee. The majority relies on Giblin's deposition testimony that a bank that sells a mortgage to Midwest is responsible for paying the title company the mortgage assignment recording fee. According to the majority, this testimony demonstrates that it is not customary for a bank to charge a borrower a mortgage assignment recording fee and that a borrower is a "stranger" to the assignment transaction.

I disagree with the majority's reasoning on several bases. First, my reading of Giblin's testimony causes me to conclude that, when he testified that the assigning bank bears the cost of the mortgage assignment fee, he was describing who was responsible for the fee in the relationship between Midwest and Gary-Wheaton, not in the relationship between Gary-Wheaton and a borrower. In addition, he explained that a lender could charge a borrower the mortgage assignment recording fee at closing, even if it did not assign the mortgage until after closing. His testimony, therefore, does not support a conclusion that the assigning bank always pays the mortgage assignment recording fee. Furthermore, Giblin's testimony concerning the relationship between Midwest and Gary-Wheaton is an insufficient basis from which to conclude that it was not customary for other banks to charge borrowers a mortgage assignment recording fee.

Second, a borrower is not a "stranger" to the assignment of its loan, as the facts of this case illustrate. As a direct result of the assignment of their mortgage to Midwest, plaintiffs in this case received an annual interest rate .05% lower than Gary-Wheaton could have offered them if it had not assigned their loan. In addition, at the time of their loan application, Gary-Wheaton informed plaintiffs that their loan would be sold.

The mortgage assignment recording fee was, therefore, a cost of plaintiffs' loan. There is no legal reason why a lender may not pass this cost on to the borrower in the same way that it charges borrowers other fees, such as document preparation fees, for its costs of doing business.

I also disagree with the majority's conclusion that a lender "conceals" the mortgage assignment recording fee by providing a borrower with a gross estimate of recording fees. It no more conceals this fee than it conceals other recording fees, such as the mortgage recording fee, that it more specifically discloses at closing on the HUD-1 form. As I have explained, a gross estimate that includes an amount for a mortgage assignment recording fee sufficiently informs a borrower of this fee and allows the borrower to make an effective comparison of the recording fees charged by various lenders. The precise identity of each recording fee, such as those for recording the mortgage, deed, and releases, as well as the assignment of the mortgage, would be of little additional help in comparison shopping for a loan.

The court's decision in *Butitta v. First Mortgage Corp.*, 218 Ill. App. 3d 12, 578 N.E.2d 116 (1991), supports a conclusion that a lender may charge a mortgage assignment recording fee in the circumstances of this case. The majority distinguishes *Butitta* on the basis that, unlike plaintiffs in this case, the plaintiffs in that case did not allege the materiality of the mortgage assignment fee. This does not make *Butitta* inapplicable to the situation before us, however, because the lack of materiality was only one of the bases for the court's finding that there was no Consumer Fraud Act violation. The court held that there was no Consumer Fraud Act violation in that case because plaintiffs had failed to show that the mortgage assignment recording fee was material or illegal.

Plaintiffs in this case may have alleged materiality, but they have failed to show that the fee was illegal. As *Butitta* holds, it is not illegal for a lender to charge a mortgage assignment recording fee at closing.

The majority argues that *Butitta* also differs from the situation before us because there was no unfairness in that case as there is here. I cannot accept this argument. In *Butitta* the sellers, who were required to pay the mortgage assignment fee, had no notice before closing that this fee would be among their costs at closing. By contrast, in this case, plaintiffs received an estimate that included this fee at the time they made their loan application. Furthermore, I do not see how it is more fair to charge a seller a recording fee for the assignment of a buyer's mortgage than it is to charge a buyer a fee for the assignment of his own mortgage, especially when he benefits from that assignment by obtaining a lower interest rate.

For the foregoing reasons, I would affirm the circuit court's judgment dismissing plaintiffs' escrow suspension fee claim, but answer the certified question in the negative.