No. 78,944

HENRY GONZALES, Individually and on Behalf of All Others Similarly Situated, *Appellant*, v. ASSOCIATES FINANCIAL SERVICE COMPANY OF KANSAS, INC., *Appellee*.

(967 P.2d 312)

Opinion filed November 6, 1998.

*Arden J. Bradshaw*, of Bradshaw, Johnson & Hund, of Wichita, argued the cause, and *Ryan Hodge*, of Ray Hodge & Associates, L.L.C., of Wichita, was with him on the briefs for appellant.

*James D. Oliver*, of Foulston & Siefkin, L.L.P., of Topeka, argued the cause, and *Martha Aaron Ross*, of the same firm, of Wichita, was with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This first impression consumer loan case, before us on summary judgment, focuses on K.S.A. 16a-2-401(9)(b) of the Kansas Uniform Consumer Credit Code (UCCC). K.S.A. 16a-2-401(9)(b) is not contained in the Model Uniform Act. It authorizes,

in addition to the permitted finance charge, a nonrefundable origination fee legislatively named a "nonrefundable prepaid finance charge."

The plaintiff, Henry Gonzales, refinanced loans with defendant Associates Financial Service Company of Kansas, Inc. (Associates) three times within a 15-month period. With the second and third refinancings, money was given directly to him. Gonzales claims the origination fees charged on the second and third refinancings were fraudulent and unconscionable. The fees were based upon the entire amount financed rather than on the smaller amount of new money given to him. The district court granted summary judgment for Associates, and Gonzales appeals.

Jurisdiction is under K.S.A. 20-3018(c), a transfer from the Court of Appeals on our motion.

The primary issue, which influences the resolution of other issues, is whether K.S.A. 16a-2-401(9)(b) allows Associates, under the facts here, to charge a nonrefundable origination fee (nonrefundable prepaid finance charge) based upon the entire amount financed, or only upon the amount of new money advanced.

Secondary issues are:

(a) Did Associates engage in unconscionable acts, violating K.S.A. 16a-5-108?

(b) Does Gonzales have a viable fraud claim?

(c) Was Associates' conduct deceptive under the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*?

Finding no error, we affirm.

K.S.A. 16a-2-401(9)(b) says:

"In addition to the applicable finance charge permitted . . . for consumer loans not secured by an interest in land, a creditor may contract for and receive, in connection with any such . . . loan, a nonrefundable origination fee in an amount not to exceed the lesser of 2% of *the amount financed* or $100, *which fee shall be a nonrefundable, prepaid finance charge.*" (Emphasis added.)

## FACTS

From 1989 to 1994, Gonzales lived in Wichita while serving in the Air Force. He enrolled in Garden City Junior College before joining the military. (He completed 43 hours of college credit in

the Air Force, primarily in non-commissioned officer school.) His duties as an aircraft fuel system mechanic required him to read and follow technical orders, job guides, and instruction manuals. He also trained in logistics and supply, and served as a supply sergeant in charge of air base tool supply.

Gonzales was a 13-year customer of Associates or an out-of-state affiliate. He obtained credit from many creditors other than Associates (including ITT, Beneficial Finance, American General Finance, Commercial Credit Corporation, Luke Federal Credit Union, Golden Plains Credit Union, Discover Card, Chase Visa, Mercantile Bank Mastercard, Sears, Montgomery Ward, J.C. Penney, Spiegel, Bank One, and Union National Bank).

Gonzales first borrowed money from Associates in Wichita in September 1992. The "amount financed" was $5,655.84, using $3,074.87 to pay off a car loan from Golden Plains Credit Union and $2,508.97 to pay off the outstanding balance he owed Associates Financial Services of Arizona. No money was given directly to him. He does not base his claim against Associates on the September 1992 loan. He asserts, however, that if he had been charged the K.S.A. 16a-2-401(9)(b) incremental origination fee rate of 2%, the result would have been a fee of $61.50 (2% of $3,074.87) instead of $100. Gonzales admits the $100 charged was disclosed as a prepaid finance charge but says he was not told that an origination fee had been charged. He looked at the September 1992 disclosure statement and went through it with an Associates' employee. He saw the disclosure of the $100 prepaid finance charge before he signed. He did not ask any questions.

Gonzales entered into the September 1992 loan agreement in order to lower his total monthly payments, thus freeing up additional spending money. His new monthly payment was $80 or $90 per month less than the combined total of his payments on the Golden Plains and Arizona loans. He testified he would not have taken out the new loan if it had not reduced his monthly payments.

Gonzales says that after September 1992, he was contacted by Associates "on a continuing basis." He received cards through the mail and telephone calls. In the mail advertising, Associates would "say to the effect to come in and see them, that they've got money,

Christmas is coming up, you know, would you like to borrow more money. You know, things like that." He testified that in telephone calls, Associates employees would say, "I had made my payments on a pretty regular basis, and that if I was interested that, you know, they could loan me some more money."

Associates employees endeavor to talk to customers in person or by telephone at least quarterly if time allows. During such contacts, Associates will check on customer satisfaction and ask if the customers have any questions. Associates will also ask creditworthy customers if they are interested in obtaining new loans. The customer is invited to come in and borrow more money. This practice is common with Associates and in the industry. If a loan is made, local Associates' managers are instructed to charge the maximum K.S.A. 16a-2-401(9)(b) origination fee. The office manager is eligible for quarterly bonuses if business performance improves.

During 1993, Gonzales spoke with an Associates employee in person or by telephone on or about March 12, April 20, May 11, and August 3. Associates' "Account Follow-Up History" reveals that on April 20, 1993, "TR" called Henry Gonzales at 14:53 to solicit him to apply for an advance of further funds. An answering machine apparently responded, and TR left a message to "call ASAP." Less than an hour later Gonzales apparently called back, and Associates' log suggests that he was solicited to apply for a further advance of money. According to the log Gonzales replied that he did not wish to do so at that time but "might need some cash down the road." Gonzales showed no current interest in borrowing additional money on each occasion. He testified, "I knew for myself that I was already overextended and I didn't really want to get any more money from them."

In May 1993, an Associates employee noted for the file that Gonzales said he did not have any cash reserve and wanted to save his credit with Associates "so if something comes up needs cash could get it here." Associates' records of an August 1993 conversation show that, in response to an inquiry about his credit needs, Gonzales replied, "maybe later for auto repair[s]."

On August 2, 1993, Gonzales purchased a 1992 Chevy van for $18,840.81. The purchase was financed under an installment credit

agreement, assigned by the dealer to a bank, with monthly payments to the bank of $329.39. Gonzales became concerned about the size of his monthly payments. In addition, he did not have enough money to pay for the license tag and property taxes on the new van. He called Associates. The office suggested he borrow additional money. He decided to take out a new loan.

On August 20, 1993, Gonzales executed a Disclosure Statement, Note, and Security Agreement (August Loan Agreement) which provided for a loan with an "amount financed" of $5,134.83. Of the amount financed, $500 was advanced in cash to Gonzales, $60 was applied to a personal property insurance premium, and $4,574.83 was applied to repay his existing loan balance. Before August 20, 1993, Gonzales was required to make loan payments to Associates of $215.29 per month. The August Loan Agreement reduced his monthly payments to $197.47. He understood that by refinancing, his monthly payments would be reduced. He did not ask Associates about the possibility of another loan in addition to the loan he had, nor was a separate loan proposed. Gonzales also understood that if he had to take out a separate loan, his payments would probably have gone up. The September 1992 note had been in effect for almost 11 months at this time. Rather than adding to that loan, Associates paid it off and wrote a new promissory note.

Associates added a $100 origination fee to the finance charge. (Gonzales claims the origination fee should have been $10, 2% of the $500.) When the note was rewritten the interest portion of the September 1992 finance charge was refunded pro rata; however, the origination fee was not refunded. Gonzales claims he was not informed that another origination fee had been charged, nor was he aware of the effect the fee had on the cost of his loan.

Gonzales made the September payment for the August loan on time but did not make the October payment. He called Associates saying his son had been in the hospital and the October payment would be made on November 4, 1993. It was. He made the November payment later in the month.

The next contact between the parties was initiated by Gonzales on December 13, 1993, when he telephoned Associates to say his son was back in the hospital and he wanted to defer a payment.

In response to his request for a deferral, Associates suggested that he could refinance the balance of his current loan and borrow an additional $400. Gonzales' credit rating had deteriorated, but he was still able to qualify for the new loan. He says Associates convinced him to borrow more money.

Gonzales executed a Disclosure Statement, Note and Security Agreement (the "December Loan Agreement") providing for an "amount financed" of $5,458.13. At closing, he received $410 in cash, $4,970.13 paid off the balance of his previous loan, and $78 paid an insurance premium on property that was security for the loan.

The December Loan Agreement required no payment until February 1, 1994, relieving Gonzales of payments for December 1993 and January 1994. The contract interest rate on the new loan was lowered to 22% compared with 22.5% under the August Loan Agreement. The amount of Gonzales' regularly scheduled monthly payment was reduced from $197.47 to $187.97. Again, rather than adding to the existing loan, the August loan was paid off and a new note was written. Another $100 origination fee was added to the finance charge. (Gonzales claims the proper origination fee for this loan was $8.20, 2% of $410.) Once again the interest component of the August 1993 finance charge was refunded pro rata, but the origination fee was not. Gonzales says: (1) He was not informed of the origination fee and (2) he had no perception of the effect the fee was having on his loan charges. He did not know that the "nonrefundable prepaid finance charge" was really a nonrefundable origination fee.

Before obtaining the August and December loans, Gonzales had comparison-shopped for credit terms and was aware that Associates charged higher rates than banks, but he had decided that Associates was his best source of credit.

With respect to each of the three loans, Associates employees (a) took a new loan application from Gonzales, (b) verified his income and employment, (c) obtained and reviewed a credit report, (d) evaluated the loan application and credit information under Associates' standards, (e) prepared a set of loan documents, including a Truth-in-Lending Act disclosure statement, and (f) met

with Gonzales to explain the loan papers and sign and close the loan. These procedures do not differ in any material respect from the procedure followed by Associates in making a loan to a first-time customer.

Part of the consideration to Associates for entering into the August and December Loan Agreements was the K.S.A. 16a-2-401(9)(b) origination fee. Gonzales' August and December Loan Agreements each disclosed that the amount financed was more than $5,000 and that there was a "prepaid finance charge" of $100 which was "not part of 'Amount Financed.' "

The August and December Loan Agreements included a statement which disclosed, among other things, the following: "PRE-PAYMENT: If you pay off early, you will not have to pay a penalty. There will be no rebate of the prepaid finance charge."

The August and December Loan Agreements also make a disclosure using the term origination fee: "PREPAYMENT: I [Gonzales] can prepay my loan at any time with interest on such payment to the date of payment. If I prepay in full, no part of the origination fee will be refunded."

Gonzales testified, concerning the closing of the August Loan Agreement, he had seen "all the figures on the sheet," he did not know what the prepaid finance charge was, he "really didn't think about it," and he did not ask any questions.

Associates went over the disclosures with Gonzales at the closing of the December Loan Agreement. Concerning the loan origination fee or prepaid finance charge, his testimony was:

"Q. And did they mention the $100?
"A. They would mention that it was the finance charge. There again, I was assuming that finance charge was part of the interest.
"Q. And you're referring to the prepaid finance charge of $100 that's shown on the first page of Exhibit 10?
"A. Right.
"Q. Did you ask him any questions about that $100 charge on this occasion?
"A. No."

Gonzales made no payments on the December Loan Agreement. Shortly after the first payment came due on February 1, 1994, he filed for bankruptcy.

Gonzales kept the 1992 Chevy van and reaffirmed the van purchase indebtedness to the bank. Associates moved for relief from the stay in order to repossess a 1987 Plymouth, the collateral on his loan. After applying the proceeds of the car's sale, Associates was left with an unsecured balance of more than $4,000, which was discharged in bankruptcy.

The district court, in entering summary judgment for Associates, concluded that Gonzales had attempted to dispute few of the facts, and "the purported disputes were not shown to be material upon review of plaintiff's own testimony and documents in the record."

## DISCUSSION

Our summary judgment standard has been frequently expressed. All facts must be taken in the light most favorable to the party who opposed summary judgment. *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 268, 875 P.2d 949 (1994). Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. K.S.A. 60-256(c). Our standard of review is de novo. *Gamblian v. City of Parsons*, 261 Kan. 541, 546, 931 P.2d 1238 (1997).

This is a statutory interpretation case. We agree with the district court's conclusion that Gonzales' factual assertions do not create any genuine issues of material fact. Statutory interpretation involves a question of law. Our standard of review is unlimited. *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 1, 930 P.2d 1366 (1997).

### Gonzales' Origination Fee Contentions

Gonzales argues that the K.S.A. 16a-2-401(9)(b) term "origination" means the fee can only be charged for the expenses in setting up the original file and making the original loan. According to Gonzales, the fee should not apply at all to refinancing. Any other interpretation, he contends, allows for "outrageously high incremental charges for the additional money borrowed," is inconsistent with the plain meaning of the language, "works an absurd result," and is contrary to the purpose of the UCCC. According to Gonzales, deception is present because no one ever told him that origination

fees were charged every time a loan was refinanced. Similarly, he reasons deception and unconscionability are present because of Associates' (1) failure to disclose that the fee is added to loan principal and (2) continuous solicitations to refinance.

Gonzales asserts fraud because the loan documents refer to a prepaid finance charge without disclosing that the only such charge was the origination fee.

## Ruling of the District Court

We summarize the district court's conclusions: (1) The definition of "amount financed" is not ambiguous; it includes the entire amount of credit extended when a loan is refinanced or consolidated with another loan. (2) Calling a loan origination fee a prepaid finance charge is not deceptive. (3) Associates had no obligation to explain the terms of the loan in any more detail or in any different manner than it did. The Truth-in-Lending provisions of the federal Consumer Credit Protection Act and Regulation Z of the Federal Reserve Board, which implements that Act, prescribe the elements of a consumer credit transaction deemed material by law for disclosure purposes. When a lender gives accurate Truth-in-Lending disclosures, as Associates did in this case, the lender has no obligation to provide additional disclosures. (4) The relationship between Gonzales and Associates was debtor/creditor, not a fiduciary relationship. (5) Associates' conduct was not unconscionable. Every loan requires clerical work and takes time, as did Gonzales' loans. A $100 origination fee is not an excessive charge under the facts here. (6) It is not the court's or a jury's province to overrule the legislature's determination. (7) The remedy for a consumer who contends that the charges permitted by the statute are too high lies with the legislature. (8) Gonzales discharged in bankruptcy the more than $4,000 he owed Associates, and in effect never paid the loan origination fees.

## The K.S.A. 16a-2-401(9)(b) Origination Fee

Our function in reviewing a statute is easily stated. It is to construe the language so as to give effect to the intent of the legislature. There is no invariable rule for the determination of that in-

tention. The legislature has instructed us that "[w]ords and phrases shall be construed according to the context and the approved usage of the language." K.S.A. 77-201 *second*. Technical words and words and phrases that have acquired a peculiar meaning in law are to be construed according to their peculiar and appropriate meanings. K.S.A. 77-201 *second*. Federal Truth-in-Lending Act (TILA), Regulation Z, 12 C.F.R. § 226 (1998) is incorporated in the UCCC by K.A.R. 75-6-26(c), K.S.A. 16a-3-206, and K.S.A. 16a-6-117. Here, the legislature is presumed to have expressed its intent through the language of the UCCC and K.S.A. 16a-2-401(9)(b). We must give effect to the intent of the legislature as expressed rather than determine what the law should or should not be. *Brown v. U.S.D. No. 333*, 261 Kan. 134, 142, 928 P.2d 57 (1996).

(1) Lenders are permitted to call origination fees "prepaid finance charges" in loan documents.

The focus of our analysis is on the legislature, both federal and state. The TILA (Regulation Z) applies to virtually all consumer loans. 12 C.F.R. § 226.1(c). Thus, state legislatures must consider the implications of Regulation Z when they tinker with their own consumer loan statutes. Why not simply call the origination fee here an origination fee? The answer can be found in a detailed analysis of Regulation Z. The discussion that follows will demonstrate that: (a) origination fees are considered prepaid finance charges under the TILA; (b) the legislature knew that to be true when it passed K.S.A. 16a-2-401(9)(b); and (c) the origination fees charged by Associates fit the definition of a "prepaid finance charge."

(a) An origination fee is a prepaid finance charge under the TILA (Regulation Z).

The exact term "origination fee" is not found in Regulation Z. However, origination fees are considered a type of finance charge. Gonzales admits as much when he states, "For purposes of disclosure, loan companies are required to treat the Origination Fee as a finance charge." A finance charge is defined as "the cost of consumer credit as a dollar amount." 12 C.F.R. § 226.4(a). 12 C.F.R. § 226.4(a) explains that a finance charge "includes any charge payable directly or indirectly by the consumer and imposed directly

or indirectly by the creditor as an incident to or a condition of the extension of credit." An origination fee meets the Regulation Z definition of a finance charge. An origination fee is a charge by the creditor and payable by the debtor. 12 C.F.R. § 226.4(a). An origination fee is an incident to or a condition of the extension of credit as well. Origination fees may be charged and paid directly or indirectly. Under 12 C.F.R. § 226.4(b)(3), an example of a finance charge includes loan fees and similar charges.

A "prepaid finance charge" necessarily includes the definition of "finance charge" above, but more specifically means "any finance charge paid separately in cash or by check before or at consummation of a transaction, or withheld from the proceeds of the credit at any time." 12 C.F.R. § 226.2(a)(23). Thus, it follows that a loan fee/origination fee paid up front or withheld from the proceeds of the loan is in fact a prepaid finance charge under Regulation Z.

(b) The legislature knew that origination fees were considered "prepaid finance charges" under Regulation Z when enacting K.S.A. 16a-2-401(9)(b).

The legislature named "origination fee" a "nonrefundable prepaid finance charge" in K.S.A. 16a-2-401(9)(b). The legislative history of K.S.A. 16a-2-401(9)(b) demonstrates why. The statute, which is not part of the Model Uniform Act, was adopted in 1988. L. 1998, ch. 85 and 86. Since 1986, lenders have been permitted to charge origination fees on consumer loans secured by real estate. K.S.A. 16a-2-401(9)(a). Testimony before the 1988 legislature advocated the need for a way to offset the expenses of making small loans. The legislature apparently recognized lenders were reluctant to make small loans because the finance charges alone were insufficient to cover the loan processing costs. Testimony from the financial service industry suggested that without such changes, the small loan market would dry up in Kansas. K.S.A. 16a-2-401(9)(b) was added to allow lenders to recoup their costs by charging a loan origination fee labeled a "nonrefundable prepaid finance charge." (Minutes of the House Committee on Commercial and Financial Institutions, March 24, 1988.)

The label seems to be deliberate. Relevant discussion on the topic can be found in the Senate committee minutes of February

18, 1998, on Senate Bill 552. There, the Senate considered proposed technical or "clean up" amendments to various sections of the UCCC, including K.S.A. 16a-2-401. While it was Senate Bill 507 which ultimately allowed the origination fee Gonzales complains of, both bills (on the same day) made changes to 16a-2-401 during the same legislative session. Senate Bill 552 labeled the 3% nonrefundable origination fee on consumer loans secured by real estate, permitted since 1986, a "nonrefundable prepaid finance charge." The committee minutes of February 18, 1998, reveal that there was thoughtful discussion concerning origination fees. The committee considered moving the sections on origination fees to 16a-2-501, which enumerates "additional charges" such as insurance, official fees, and taxes. This suggestion was quickly disposed of due to Regulation Z.

As previously explained, under the TILA (Regulation Z) origination fees are considered finance charges. See 12 C.F.R. § 226.4(b)(3). 12 C.F.R. § 226.18(c)(iv) of Regulation Z mandates disclosure of "the prepaid finance charge." The committee was concerned that if the statute was amended to include origination fees as "additional charges" (in 16a-2-501) but lenders were required to disclose the origination fee as "the prepaid finance charge" under Regulation Z, the amendment might lead to confusion. Specifically, the minutes read: "If it is put in state law as not a finance charge, but lenders have to disclose it as a finance charge under the truth in lending, it becomes confusing." See Minutes of Senate Committee on Financial Institutions and Insurance, February 18, 1988, p. 2. The committee ultimately decided to keep the origination fees (for loans secured by real estate) in 16a-2-401 as a "nonrefundable prepaid finance charge." During the same committee hearings, when considering Senate Bill 507 allowing origination fees for loans not secured by real estate, the committee logically added this new origination fee to section 16a-2-401 as subsection (9)(b) and once again labeled the origination fee a "nonrefundable prepaid finance charge." The 12 C.F.R. § 226.18(c)(iv) Regulation Z disclosure requirement suggests that the legislature purposely used the term "prepaid finance charge."

There is an absence of any legislative discussion tending to support Gonzales' contention that the fee was intended to apply only to the original set up of a consumer's loan file with the lender. Gonzales advances no support for his reading of K.S.A. 16a-2-401(9)(b) other than a general legislative intent to aid and protect consumers. Gonzales' contention that the statute does not permit a lender to call an origination fee a prepaid finance charge lacks merit.

Under the statute, the origination fee is an amount "not to exceed the lesser of 2% of the amount financed or $100." K.S.A. 16a-2-401(9)(b). The amount financed in the August and December Loan Agreements exceeded $5,000. Both loans say that Gonzales is being charged $100 in "prepaid finance charge[s]." Similarly, the agreements disclose the fact that prepaid finance charges will not be rebated in the event of prepayment. See 12 C.F.R. § 226.18(k)(2) (1988). Gonzales did not pay the origination fee up front. The origination fee charged here was withheld from the proceeds of Gonzales' loan.

(c) The origination fee was withheld from the proceeds of the loans to Gonzales.

We acknowledge that it is difficult to determine how the origination fee is paid from the face of the loan documents. However, we do not attribute the difficulty to an attempt to deceive on the part of Associates. The difficulty arises because of state legislation and the rigid disclosure requirements of Regulation Z.

Gonzales' loan documents contain certain disclosures mandated by Regulation Z. The documents also contain certain definitions of the terms on the documents; also mandated by Regulation Z.

For the purposes of our discussion, the two most important disclosures a creditor must make under Regulation Z are (i) the amount financed and (ii) the itemization of the amount financed. See 12 C.F.R. § 226.18(b) and (c).

(i) Amount Financed:

The amount financed must be disclosed "using that term, and a brief description such as *the amount of credit provided to you or*

*on your behalf."* 12 C.F.R. § 226.18(b). The amount financed is calculated by:

"(1) Determining the principal loan amount . . . ;
"(2) Adding any other amounts that are financed by the creditor and are not part of the finance charge; and
"(3) *Subtracting any prepaid finance charge."* (Emphasis added.) 12 C.F.R. § 226.18(b)(1)-(3).

The "amount financed" is disclosed on Gonzales' loan documents. The "amount financed" is also defined as "the amount of credit provided to you or on your behalf." 12 C.F.R. § 226.18(b). This definition was on Gonzales' loan documents, as Regulation Z requires. The amount financed does not include the prepaid finance charge, also as mandated by Regulation Z.

(ii)    Itemization of Amount Financed

Creditors must include a separate written itemization of the amount financed. 12 C.F.R. § 226.18(c). This statement includes four things: (1) the amount of any proceeds distributed directly to the consumer; (2) the amount credited to the consumer's account with the creditor; (3) any amounts paid to other persons by the creditor on the consumer's behalf; and (4) the prepaid finance charge. The prepaid finance charge is not a part of the amount financed. The fact that the prepaid finance charge is included in the "itemization of amount financed" is, thus, counter-intuitive, but inclusion is what 12 C.F.R. § 226.18(c) requires.

With the Regulation Z requirements in mind, we now turn to Gonzales' loan documents. Our question is how the $100 origination fee was paid here. The formula for calculating the amount financed provides part of the answer. A creditor must take the principal loan balance and subtract, among other things, the origination fee to arrive at the "amount financed." The amount financed on Gonzales' December Loan Agreement is $5,458 (rounded). Thus, Associates had to take the principal amount of the loan and subtract the $100 fee to arrive at $5,458. Unfortunately, this calculation was not done on the loan documents themselves. Therefore, no principal amount of $5,558 appears on the December Loan Agreement. However, $5,558 is noted on the Au-

gust Loan Agreement where Associates employees marked the old August note "Made Again." There, Associates recorded the loan number of the December Loan Agreement, the date, and the amount of the new loan: $5,558.

Gonzales' December loan was for $5,558, not $5,458. Associates subtracted the origination fee from the principal loan amount. In doing so, Associates withheld the origination fee from the proceeds of the loan.

Should Associates be faulted for not showing this principal amount on the loan documents? We think not. We believe the Regulation Z disclosure requirements for the forms could be improved; however, federal form improvement is not a state judicial function. The model loan form endorsed by the TILA does not contain such a disclosure. Associates' loan forms track with the model form, and each disclosure made on the model form was made by Associates. See 12 C.F.R. pt. 226, app. H.

We next consider payment of the origination fee. The origination fee is part of the principal, but not part of the amount financed for interest purposes. In other words, no interest is charged on the origination fee of the loan. The origination fee is a part of the cost of the credit to the consumer. As such, it is reflected in the annual percentage rate or APR. The yearly interest rate on Gonzales' December loan was 22.50%; however the APR was 23.91%. This 1.41% difference is where the $100 origination fee is reflected. Gonzales acknowledged this, saying: "The stated interest rate on the loan was 22.5% and the effective annual percentage rate with the addition of the origination fee came to 23.92%." This reflection of the origination fee in the APR as a finance charge is also mandated by Regulation Z. 12 C.F.R. § 226.22(a)(1). Thus, the origination fee is properly reflected in the APR as a 1.41% increase.

Admittedly, when a consumer refinances, the unpaid portion of the origination fee is rolled over into the new loan. Only then does a consumer pay interest on an origination fee.

The loan documents told Gonzales he was being charged a prepaid finance charge of $100. The documents also told him that the prepaid finance charge would not be rebated.

(2) Lenders are permitted to base the amount of the origination fee on the entire amount financed.

According to Gonzales' definition, (1) no credit is extended in a refinancing, and (2) if a loan is refinanced with the same lender without new money advanced, the "amount financed" is redefined as zero. We disagree. Gonzales' interpretation appears to contradict both the UCCC and TILA, Regulation Z. See K.S.A. 16a-1-301(4); 12 C.F.R. § 226.18(b).

K.S.A. 16a-1-301(4)(b) and (c) define "amount financed" as follows:

> "Amount financed" means the total of the following items:
>
> . . . .
>
> "(b) in the case of a loan, the net amount paid to, receivable by, or paid or payable for the account of the debtor, plus the amount of any discount excluded from the finance charge (paragraph (b) of subsection (18) of section 16a-1-301); and
>
> "(c) in the case of a sale or loan, to the extent that payment is deferred and the amount is not otherwise included and is authorized and disclosed to the customer:
>
> (i) Amounts actually paid or to be paid by the creditor for registration, certificate of title, or license fees, and
>
> (ii) permitted additional charges (section 16a-2-501)."

We conclude Associates acted within the letter of K.S.A. 16a-2-401(9)(b) in charging a $100 origination fee for Gonzales' August and December loans because the amount financed in each case exceeded $5,000.

Our conclusion is supported by the language of K.S.A. 16a-2-504, which specifically contemplates refinancing of consumer loans. K.S.A. 16a-2-504, adopted from the Model Code in 1973, authorizes refinancing of the unpaid balance by agreement with the consumer. The statute provides that "the amount financed resulting from the refinancing shall be comprised of the total of the unpaid balance and the accrued charges on the date of the refinancing." The Kansas Comment to 16a-2-504 says, in part: "The amount financed for the new transaction is equal to *the unpaid balance of the old transaction* plus accrued charges at the date of refinancing." (Emphasis added.)

Any unaccrued interest in a precomputed transaction must be credited to the consumer before calculating the amount financed

in a refinancing. Regulation Z, 12 C.F.R. § 226.20(a) provides that "[a] refinancing is a new transaction requiring new disclosures to the consumer." We will not rewrite K.S.A. 16a-2-401(9)(b) to say that (1) the statutory origination fee may be charged on only part of the amount financed and (2) "amount financed" means the amount of credit extended excluding credit extended to refinance previously incurred debt with the same lender. K.S.A. 16a-2-401(9)(b) permits the creditor to receive an origination fee with "any such loan," which includes loans that are in whole or in part refinancings of existing loan balances.

We note in reviewing the record, correspondence in 1994 between William Caton, Kansas Consumer Credit Commissioner, and Keith Jones, President of Kansas Association of Financial Services (KAFS) concerning origination fee/prepaid finance charges on refinanced consumer loans. It was attached without comment to Gonzales' motion in opposition to summary judgment. In the correspondence the Commissioner opined that the industry's practice of charging prepaid finance charges on the entire principal of a refinanced loan "within a short time period of the original loan is unconscionable." He suggested a policy that would charge a prepaid finance charge only on the new money portion of the refinanced loan within a specific time period. He did not wish to address the issue statutorily, but preferred the industry to stop the practice and police itself voluntarily. K.S.A. 16a-6-111 authorizes the Commissioner to file civil actions to restrain a creditor from enforcing unconscionable terms. The Commissioner is given broad investigative powers over the consumer loan industry. See K.S.A. 16a-2-305 (examination and investigation) and K.S.A. 16a-6-104 (powers of administrator). The KAFS responded, saying that as an informal understanding, effective January 2, 1995, its members would charge the K.S.A. 16a-2-401(9)(a) and (b) fees on new money only on consumer loans refinanced by the same lender within the first 6 months of the term of the loan. After 6 months no voluntary K.S.A. 16a-2-401(9)(b) origination fee restriction would be imposed.

Neither the district judge in his findings and conclusions nor the parties in their briefs or at argument on appeal reference the cor-

respondence; thus, it plays no role in resolving this case. We do note, however, that only one of Gonzales' loans would have violated this voluntary 6-month rule. Only 4 months had passed when Associates made their last (December) loan to Gonzales. They charged him a $100 origination fee. Gonzales never made a payment on the December loan.

The UCCC has continued to receive legislative oversight. The 1997 Kansas Comment to K.S.A. 16a-1-101 says, in part: "The U3C has been amended several times since its enactment in 1973; indeed, amendment has become an almost annual process." (See the Revisor's Note for Chapter 16a for the origin of the Kansas Comments.) The UCCC may be inadequate for failing to require explicit disclosure of either the disadvantages or advantages of refinancing versus taking out a new loan. If so, the remedy lies with the legislature.

### Associates' Conduct Under the UCCC-Unconscionability

As an equitable remedy, whether a contract is unconscionable has traditionally been a question of law for the court. This tradition endorsed by the Model Act has been changed in K.S.A. 16a-5-108, which provides that the trier of fact determines whether a particular bargaining context or contract clause is unconscionable. Enforcement, however, remains with the court.

K.S.A. 16a-5-108(3) provides that "a charge or practice expressly permitted by this act is not unconscionable." Associates argues the origination fees it charged are authorized by the UCCC; therefore, under K.S.A. 16a-5-108(3), its actions cannot be unconscionable. Gonzales responds that the circumstances here show a churning of loans, excessive origination fees, and unconscionable conduct. Gonzales relies upon K.S.A. 16a-5-108, Comment 5, which provides:

"Subsection (3) prohibits a finding that a charge or practice expressly permitted by the U3C is in itself unconscionable. However, even though a practice or charge is authorized by the U3C, the totality of a particular creditor's conduct may show that the practice or charge is part of unconscionable conduct."

K.S.A. 16a-5-108 itself suggests Gonzales' claim for damages based on unconscionability is miscast. Unconscionability under the

UCCC is an affirmative defense to the enforcement of a credit agreement. K.S.A. 16a-5-108 does not create an independent claim for damages. Consumer remedies, *i.e.*, affirmative claims for damages under the UCCC are set out in K.S.A. 16a-5-201. Gonzales relies on *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 549 P.2d 903 (1976) (an advertiser who had been left out·of the yellow pages sought to avoid enforcement of contractual limitation on remedies). In *Wille*, which is not a UCCC case, the contract in issue limited Southwestern Bell's liability to the cost of the advertisement. Gonzales also cites *Topeka Datsun Motor Co. v. Stratton*, 12 Kan. App. 2d 95, 107-08, 736 P.2d 82, *rev. denied* 241 Kan. 840 (1987) (Stratton alleged unconscionability under K.S.A. 16a-5-108 as a defense to repossession of her Datsun pickup by plaintiff dealer). Gonzales' authorities are examples of asserting unconscionability unsuccessfully to avoid enforcement of a contract in whole or in part.

Neither party has directed us to a statute similar to K.S.A. 16a-2-401(9)(b) or to case law addressing origination fee/nonrefundable prepaid finance charge unconscionability. Gonzales has not cited any case in which a practice authorized by the UCCC has been held to be unconscionable conduct under the UCCC.

Comment 5 to K.S.A. 16a-5-108 stands as a caveat to lenders. Where *enforcement* of a loan agreement is at issue, we do not foreclose the possibility that in a future case, conduct which facially complies with K.S.A. 16a-2-401(9)(b) may not find a "safe harbor" in the language of 16a-5-108(3). In such cases, the trial court may consider "the creditor's total conduct, including that part of the creditor's conduct which is in accordance with the provisions of the U3C." K.S.A. 16a-5-108, Comment 5. We conclude Comment 5 is not implicated here.

## The Fraud Claim

A fraud claim presents no special test of the evidence different from the usual standards on summary judgment. *Dugan v. First Nat'l Bank in Wichita*, 227 Kan. 201, 207, 606 P.2d 1009 (1980).

Gonzales' fraud claim is not based on any allegedly false statement. However, he asserts Associates should have provided him

with additional information concerning the financial impact of the transactions. He keys his fraud claim to Associates' plan of operation. Gonzales contends Associates' acts were fraudulent because: (1) material facts were actively concealed, (2) material facts were omitted, and (3) ambiguous statements or half-truths were made. He claims Associates' "campaign to induce refinancing" was fraudulent. "Fraud may arise by the concealment of facts which legally or equitably should be revealed, as well as by affirmative misrepresentation. [Citation omitted.] The deliberate suppression of a fact that a party has a duty to disclose is fraud." *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 465, 738 P.2d 1210 (1987). Gonzales concedes Associates made all disclosures required by law but advances fraud by silence, claiming Associates had a duty to make additional disclosures.

As Gonzales sets out the elements of this claim, two problems arise. First, Associates must have knowledge of material facts which Gonzales did not have and could not have discovered through diligence. Gonzales admits that he saw the prepaid finance charge and did not ask any questions. He does not claim that he exercised diligence to understand the nature of the charge. He has also failed to claim that he could not have discovered the information. Second, Associates must have been under a duty to speak. Gonzales fails to identify the basis for the alleged duty owed to him by Associates. The duty did not arise out of the relationship of the parties as creditor-debtor. *First Bank of WaKeeney v. Moden*, 235 Kan. 260, 262, 681 P.2d 11 (1984) ("Ordinarily, the relationship between a bank and its customer is that of creditor-debtor and not that of a fiduciary.").

Gonzales, in essence, claims that because Associates undertook to make disclosures, it had the duty to further disclose the effect of refinancing on his overall financial picture. In support of this proposition, he relies on *Sparks v. Guaranty State Bank*, 182 Kan. 165, 168, 318 P.2d 1062 (1957), and *Gilmore*, 226 Kan. at 667.

Although Gonzales cites language from *Sparks* and *Gilmore* that appears helpful, an examination of the facts in each case reveals the contrary. *Sparks* involved a bank officer making affirmative misrepresentations to the holder of a returned check concerning

the financial picture of the maker of the check. The bank officer assured the holder of the check that the maker was not financially unstable, which was false. These misrepresentations caused Sparks to forbear the remedies of self-help and legal action against the maker of the check. The bank, in turn, benefitted from Sparks delay in asserting his rights. *Gilmore* arose from the sale of diseased cattle to an unknowing purchaser. The purchaser obtained financing through the bank. When the purchaser went bankrupt after discovering the cattle were diseased, the bank sued the sellers for fraud and misrepresentation. Summary judgment for the defendant-sellers was reversed with directions to reinstate the action. The sellers concealed or otherwise omitted necessary facts (that the cattle were diseased) and thus could be held liable. 226 Kan. at 672.

*Sparks* and *Gilmore* are neither factually nor legally similar to Gonzales' case. They do not support his contention that Associates had a duty to make further disclosures.

Gonzales presented no evidence tending to prove the existence of any practice or custom in the consumer loan industry to make disclosures beyond those required by federal and state law. Further, he has identified no objective circumstances from which a duty to make disclosures besides those required by law would arise. There is no evidence that Associates thought Gonzales was incapable of understanding the transactions. He had obtained credit from at least 15 other creditors in the past. Associates' representatives explained the documents and afforded him the opportunity to ask questions, and none of his questions were unanswered. Gonzales testified he comparison-shopped for credit terms before deciding to refinance his loans with Associates. He has not shown that Associates either actively concealed information or had information he could not have discovered.

A recent Alabama UCCC case with similar facts is of interest. *Williams v. Norwest Financial Alabama, Inc.,* 723 So. 2d 97 (Ala. Civ. App. 1998). Williams and her mother, Brown, sued Norwest alleging, among other claims, fraudulent misrepresentation and suppression arising from loan transactions.

The plaintiff borrower (Brown) claimed that:

"Norwest fraudulently suppressed the fact that financing alternatives existed that were less expensive than refinancing. Brown contends that Norwest practices 'flipping,' a practice whereby customers are encouraged to refinance existing loans rather than make new and separate loans. Brown argues that the loan offered by Norwest are primarily closed-end transactions in which the interest and finance charges are determined at the time the loan originates. She states that these charges are applied early in the term of the loan and that as the term of the loan progresses the charges decrease. She contends that Norwest induces its customers to refinance the existing loans early in their terms so that the customers are continually paying the interest and finance charges at a higher rate." 723 So. 2d at 104.

In affirming summary judgment for Norwest, the Alabama court said:

"Brown refinanced the January 1990 loan with the April 1992 loan. She contends that the effect of taking the second loan without having paid the balance on the prior loan should have been disclosed to her, along with the fact that other financing alternatives existed. Suppression of a material fact that one has a duty to communicate constitutes fraud. [Citation omitted.] The duty to speak or to disclose certain facts may arise from a confidential relationship between the parties, the particular facts or circumstances of each case, or a request for information. [Citations omitted.] Brown testified that she never discussed with Norwest the effects of refinancing the January 1990 loan with the April 1992 loan and did not inquire as to any financing alternatives. Additionally, no evidence exists that would give rise to a confidential relationship between the parties. Brown had previously dealt with Norwest on a number of occasions; however, prior business contact alone does not give rise to a confidential relationship. [Citation omitted.] Nothing in the record indicates that the transaction complained of was anything other than an arm's-length transaction between the parties. Accordingly, we conclude that the summary judgment was properly entered in favor of Norwest on this count. Our holding should not be construed as meaning that a fraudulent-suppression cause of action cannot arise out of the practice of 'flipping.' While nothing prohibits the refinancing or consolidation of an existing loan with a subsequent loan, the practice has the potential for less scrupulous lenders to prey on a certain segment of our society and under certain circumstances could rise to the level of fraud. Our holding is expressly limited to the facts of this case." 723 So. 2d at 104.

We agree with *Brown's* conclusion concerning "loan flipping," which, under certain circumstances, could rise to the level of fraud.

Although Gonzales admits that "at any point in time the representations regarding interest rate and various charges were true," he asserts that Associates knew "at the time of each representation

that it intended to engage in a pattern of activity that would most likely make such representations untrue." Gonzales would impose a duty on creditors to make disclosures tailored to reflect the impact of *subsequent events*. However, according to Regulation Z, "[i]f a disclosure becomes inaccurate because of an event that occurs after the creditor delivers the required disclosures, the inaccuracy is not a violation of this regulation . . . ." 12 C.F.R. § 229.17(e) (1998). Regulation Z also notes that "[a] refinancing is a new transaction requiring new disclosures to the consumer." 12 C.F.R. § 226.20(a). But Associates made new disclosures with each refinancing, fully complying with Regulation Z disclosure requirements. If a remedy is to be crafted for this type of a "what might occur in the future" UCCC complaint, it must be supplied by the legislature.

Gonzales also claims that the promissory notes were ambiguous, and thus the duty to exercise reasonable care under the Restatement of Torts (Second) § 551 (1996) exists. We disagree. Section 551 is not applicable here. Associates made all required disclosures. Regulation Z defines a prepaid finance charge as "any finance charge paid separately in cash or by check before or at consummation of a transaction, or withheld from the proceeds of the credit at any time." 12 C.F.R. § 226.2(23) (1998). Regulation Z also mandates that loan origination fees are considered finance charges. 12 C.F.R. § 226.4(b)(3). The legislature has identified the origination fee at issue here as a prepaid finance charge. K.S.A. 16a-2-401(9)(b). Identifying an origination fee as a prepaid finance charge is not false or fraudulent. As we said in *Moore v. State Bank of Burden*, 240 Kan. 382, 389, 729 P.2d 1205 (1986), *cert. denied* 482 U.S. 906 (1987):

"A suppression or concealment of the truth is not at all times such fraud or deceit as will be relieved against. *DuShane v. Union Nat'l Bank*, 223 Kan. 755, 760, 576 P.2d 674 (1978). There must be a concealment of facts which the party is under a legal or equitable duty to communicate and in respect of which he could not be innocently silent."

Again, the legislature is Gonzales' forum. If additional disclosures are to be required of creditors in consumer loan transactions, the new disclosure requirements should originate with the legislature.

Gonzales also asserts we held in *Wolf v. Brungardt*, 215 Kan. 272, 282, 524 P.2d 726 (1974), that a bank owed a contractual duty to a plaintiff to communicate facts where, among other things, there was a significant disparity of business acumen between the plaintiff and the bank. *Wolf* does not support Gonzales' contention. The bank in *Wolf* was absolved from any liability by the jury, and the issue of its liability was not before us on appeal.

Gonzales relies on *Emery v. American General Finance, Inc.*, 71 F.3d 1343 (7th Cir. 1995). *Emery* is a Racketeer Influenced and Corrupt Organizations Act mail fraud case. Emery borrowed money from American General Finance (AGF) and was making her payments on time. After approximately 6 months AGF wrote her and told her they had more money for her if she wanted it. The letter said:

"Dear Verna:

"I have extra spending money for you.

"Does your car need a tune-up? Want to take a trip? Or, do you just want to pay off some of your bills? We can lend you money for whatever you need or want.

"You're a good customer. To thank you for your business, I've set aside $750.00° in your name.

"Just bring the coupon below into my office and if you qualify, we could write your check on the spot. Or, call ahead and I'll have the check waiting for you.

"Make this month great with extra cash. Call me today—I have money to loan.

"°Subject to our normal credit policies." 71 F.3d at 1345.

At the bottom of the letter was a coupon captioned, " '$750.00 Cash Coupon' " made out to her at her address. The small print explained, " 'This is not a check.' " 71 F.3d at 1345. Verna Emery wanted more money, and AGF refinanced her loan. AGF increased her monthly payment from $89.47 to $108.20 and gave her a check for $200, besides paying off her original loan. The cost to her came to about $1,200 paid over 3 years for the right to borrow $200. If she had taken out a new loan rather than refinancing her old one, it would have cost her roughly one-third less, which AGF did not disclose.

The letter sent to Emery makes it appear AGF was offering her a new loan. Only after she went to AGF's office did she find out that she was refinancing an old loan. The misleading letter in *Em-*

*ery* is absent here. *Emery* does not hold that refinancing is fraud. A divided court in *Emery* does hold that the allegations of fraud in the complaint are sufficient to withstand a motion to dismiss for failure to state a claim. 71 F.3d at 1348. *Emery* concludes:

"We do not hold that 'loan flipping' is fraud, because the boundaries of the term are obscure. We do not hold that American General Finance engaged in fraud, or even in 'loan flipping.' We do not hold that the mail fraud statute criminalizes sleazy sales tactics, which abound in a free commercial society." 71 F.3d at 1348.

Here, Gonzales advances no claim that Associates affirmatively misstated anything. We find no fraud in Associates' refinancing activities.

### The Kansas Consumer Protection Act (KCPA)

Gonzales contends his claims under the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*, should survive summary judgment. He argues that complying with the law by making all required disclosures does not insulate Associates' deception from the KCPA. Gonzales accuses Associates of having engaged in "the practice of soliciting multiple refinancings," resulting in "deception that the Truth-In-Lending Act was not designed to prevent." According to Gonzales, Associates willfully concealed the cost of refinancing, as evidenced by the practice of soliciting customers to refinance. Gonzales claims Associates ambiguously refers to the origination fee as a prepaid finance charge. The result, he asserts, is concealing the "astronomical incremental expense of borrowing small amounts of additional funds when an origination fee is charged on the full amount loaned. . .; the failure to disclose the true loan balance and that the origination fee was actually added to the principal balance." He does not address the fact that Associates could have charged him a 36% interest rate on the "new money" advanced as a separate loan because of the small dollar amount. See K.S.A. 16a-2-401(2); K.A.R. 75-6-24 (authorizing such a rate on loans of $780 or less).

We said in *Manley v. Wichita Business College*, 237 Kan. 427, Syl. ¶ 2, 701 P.2d 893 (1985): "Whether a deceptive act or practice has occurred under the Kansas Consumer Protection Act is not a

question of law for the court, but rather a question of fact for the jury to decide."

Although the issue of whether a supplier has engaged in a deceptive act in violation of the KCPA typically is a jury question, summary judgment is appropriate if there is no evidence of deceptive conduct. See *Stair v. Gaylord,* 232 Kan. 765, 775-776, 659 P.2d 178 (1983) (directed verdict for defendant on K.S.A. 50-626[b][3] and K.S.A. 50-627[b]; KCPA claims affirmed because no evidence of deceptive or unconscionable acts presented, reversed on other KCPA claims).

Specifically, Gonzales contends Associates violated K.S.A. 50-626(b), which provides, in part:

"Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act, whether or not any consumer has in fact been misled:

. . . .

"(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;

"(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact."

In defense of its actions, Associates claims it fully complied with TILA requirements and thus its behavior cannot be deceptive.

We find no showing in the record that Associates either purposefully withheld relevant information or misstated facts with the intention of deceiving Gonzales. See *Porras v. Bell,* 18 Kan. App. 2d 569, 570-71, 857 P.2d 676 (1993) (intent is a required element for a claim under the KCPA). Transactions that merely appear unfair, or in retrospect are bad bargains, do not state a claim under the KCPA. See *Remco Enterprises, Inc. v. Houston,* 9 Kan. App. 2d 296, 300-03, 677 P.2d 567, *rev. denied* 235 Kan. 1042 (1984) (a 20-year-old single welfare mother of three with a ninth-grade education who would have had to pay 108% more than a cash customer for a TV on a rental agreement with option to purchase held no violation of the unconscionability section of the KCPA). Where a record is "devoid of any evidence of deceptive or oppressive practices overreaching, intentional misstatements, or con-

cealment of facts," there is no claim under the KCPA. 9 Kan. App. 2d at 303.

The action which stimulates all of Gonzales' complaints is Associates charging an origination fee based on the amount financed, including refinancing rather than only on the amount of new money advanced with the August and December loans. Gonzales relies on *In re Tucker*, 74 Bankr. 923 (Bankr. E.D. Pa. 1987). The bankruptcy court in *Tucker*, on a loan secured by real estate, denied the borrower's usury claim. The debtor contended that the lender was required to rebate unearned service charges imposed as finance charges on a series of loans when the loans are refinanced. The bankruptcy judge noted that because the debtor had not invoked the Pennsylvania Unfair Trade Practices and Consumer Protection Law, in asserting his usury claim, he was not foreclosed from doing so. 74 Bankr. at 927-28.

The dictum in *Tucker* is of no assistance to Gonzales here. We find no violation of the KCPA.

Associates' finance charges, disclosures, and practices, which appear to mirror other lenders in the Kansas consumer loan industry, may not seem fair to some who walk and work on Main Street, Kansas; however, Associates' conduct, under the facts here, violates neither statute nor case law. Relief lies with the legislature.

Affirmed.

LOCKETT, J., dissenting: I respectfully dissent from the majority's finding that the lender's acts were not unconscionable or deceptive, that the lender's charge of an origination fee for a refinanced loan is permitted, and that the district court's grant of summary judgment to the lender was proper.

The majority acknowledges that whether a deceptive act or practice has occurred under the Kansas Consumer Protection Act is not a question of law for the court, but rather a question of fact for the jury to decide. *Manley v. Wichita Business College*, 237 Kan. 427, Syl. ¶ 2, 701 P.2d 893 (1985). It also notes that in the district court the burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in

favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. The majority acknowledges on appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 (1995). Simply stated, I differ.

The underlying policies of the Uniform Consumer Credit Code (UCCC) include furthering consumer understanding of the terms of credit transactions, protecting consumer borrowers against unfair practices, and providing credit to consumers at reasonable cost. K.S.A. 16a-1-102.

The manager of the Wichita Associates' office testified during his deposition that the $100 maximum origination fee is always charged on every loan whether it is a new loan or a loan that is refinanced by a borrower. In addition to the quarterly national solicitations by the company, the Associates manager testified that the local offices telephone their customers during slow times to see if they are interested in borrowing additional money. In fact, the manager stated that his job depends upon him doing so.

The Associates loan document states that a "prepaid finance charge" in the amount of $100 is to be applied to each refinanced loan. The prepayment clause of the promissory note indicates that in the event of prepayment, "prepaid finance charges" will not be rebated. Associates never informed Gonzales that the "prepaid finance charge" was in fact an origination fee. He believed it was prepaid interest charged for borrowing money. Had he known he was paying a $100 fee to obtain additional small sums, Gonzales would not have refinanced two of his loans.

The parties' dispute centers around what origination fee a finance company can charge when it refinances a loan and adds a small amount to the refinanced loan. K.S.A. 16a-2-401(9)(b) provides that a lender may contract for and charge "a nonrefundable origination fee in an amount not to exceed the lesser of 2% of the amount financed or $100, which fee shall be a nonrefundable, prepaid finance charge." The statute does not define "amount financed," nor does it address to what amount the fee should apply in cases of refinancing.

In his petition, Gonzales alleges that it is unlawful to charge an origination fee for a refinanced loan. He asserts that only the new sum of money added to the refinanced loan is subject to the origination fee. He argues that Associates' actions were unconscionable, deceptive acts as defined in the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 et seq., and constituted fraud.

Gonzales argues that the plain meaning of the term "origination fee" is that one can be charged only for expenses of setting up an original file or taking out the original loan, i.e., an origination fee does apply to refinancing an existing loan. He contends that any other interpretation allows for "outrageously high incremental charges for the additional money borrowed." According to Gonzales, Associates' interpretation is contrary to the purpose of the Act.

The plaintiff is not alone in claiming that Associates' actions were unconscionable. On July 22, 1994, William Caton, the Kansas Consumer Credit Commissioner, wrote a letter to the president of the Kansas Association of Financial Services (KAFS). In the letter, he addressed the practice of charging origination fees on entire refinanced amounts rather than on just new money added to the loan where the refinancing occurs within a short period of time. He stated: "It is the opinion of this office that charging prepaid finance charges on the entire principal of a refinanced loan within a short time period of the original loan is unconscionable." Noting the Kansas UCCC does not specifically address the issue, the Commissioner said failure to voluntarily cease this practice would result in his seeking a legislative remedy.

In response, KAFS's president wrote that in his view the statutes and regulations are silent on the matter, but that the Association would voluntarily refrain from charging origination fees based upon the entire refinanced amount where the refinancing occurs within 6 months of the original loan. Refinancing that occurs within 6 months of the original loan will still incur an origination fee; it will be based only upon the "new money." Finally, KAFS agreed that any violation of the agreement by KAFS's members "should be noted during the course of ordinary compliance exams by the Office of Consumer Credit."

As a general rule, statutes are construed to avoid unreasonable results. Neither the statute, nor the Act, defines origination fee or how it should be charged when an existing loan is refinanced and additional money is borrowed. Similarly, no Kansas court has decided whether origination fees, which are paid prior to obtaining a loan, may be applied to refinancing consumer loans and whether interest may be charged on origination fees, the new money borrowed, and the amount refinanced during the term of the new loan.

The majority points out that K.S.A. 16a-5-108(3) provides: "For the purpose of this section, a charge or practice expressly permitted by this act is not unconscionable." The majority fails to note that the statute does not state that origination fees may be based upon the refinanced amount. Under such circumstances, the origination fee is not expressly permitted by the Act. The statute is silent on the matter; therefore, it does not *expressly* permit origination fees based upon the amount refinanced.

The majority acknowledges that Kansas Comment 4 to K.S.A. 16a-5-108(3) states that even though a practice or charge is authorized by the UCCC, the totality of a particular creditor's conduct may show that the practice or charge is part of unconscionable conduct. Under these circumstances, the labeling of origination fees as "prepaid finance charges" is deceptive. Associates does not inform a borrower that origination fees are charged every time a loan is refinanced. The incremental cost of borrowing small additional amounts is hidden in the written agreement. The failure of the lender to disclose to the borrower that the fee is added to loan principal is deceptive, charging to refinance loans is not expressly

permitted by the statute, and the manner in which it is done is deceptive.

In *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 758-59, 549 P.2d 903 (1976), we set forth 10 factors by which unconscionability is determined:

"(1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position [citations omitted]; (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods [citations omitted]; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect [citation omitted]; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract [citation omitted]; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate [citation omitted]; and (10) inequality of bargaining or economic power. [Citations omitted.]"

Applying these factors to the case at hand, I find many of the factors exist. The contract between Gonzales and Associates was drafted by Associates. There is no evidence Gonzales could negotiate the terms. In fact, the Associates' branch manner testified even individuals who had perfect credit could not negotiate an interest rate more than one or two percent less than the statutory maximum.

None of the contracts signed by Gonzales indicated that he was being charged an origination fee. It did indicate he was being charged a "prepaid finance charge." Gonzales testified that he believed the "prepaid finance charges" were simply interest he was paying in advance. He said he did not know he was being charged origination fees at all. There are two definitions sections in each loan agreement. One states that in the event of prepayment, origination fees will not be refunded; the other states that prepaid finance charges will not be rebated. This is confusing and indicates the presence of factors 6 and 7.

The Associates' branch manager testified that his office policy was to solicit customers to take new loans and the same was true in the solicitation of Gonzales. This was true, according to the manager, despite Gonzales' falling credit rating. One new refinancing occurred when Gonzales asked, not for more money, but simply to delay payment by one month so that he could pay doctors' bills for his sick child. Rather than agree to a deferred payment arrangement, Associates told him the only way to accomplish his goal was to refinance his existing loan. Of course, unbeknownst to Gonzales, Associates was going to charge him another $100 origination fee to do so. These facts seem to indicate the existence of the ninth factor above.

As to inequality of bargaining or economic power, the tenth factor, to ask whether there was an inequality of bargaining or economic power is to answer the question. The evidence indicates Associates was the only place Gonzales could borrow money. Gonzales testified that he sometimes had to borrow money to meet his basic living needs.

Concealing the identity of the origination fee by calling it a prepaid finance charge is fraudulent because it conceals the fact that the charge is not refundable when the loan is prepaid.

Based upon the facts, the statutory requirement that unconscionability be determined by the trier of fact, and the standard requiring inferences to be decided in favor of the nonmoving party, summary judgment on the issue of unconscionability was inappropriate.

The district court's grant of summary judgment on Gonzales' fraud claim was also improper. It is important to note that the existence of fraud is normally a question of fact and, thus, not appropriate for summary judgment. *Gragg v. Rhoney*, 20 Kan. App. 2d 123, 126, 884 P.2d 443 (1994), *rev. denied* 256 Kan. 994 (1995). We have stated that fraud may arise by the concealment of facts which legally or equitably should be revealed, as well as by affirmative representation. *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 465, 738 P.2d 1210 (1987) (citing *Citizens State Bank v. Gilmore*, 226 Kan. 662, 667, 603 P.2d 605 [1979]). Under the UCCC, there is a legal or equitable duty to communicate in respect of

which Associates could not be innocently silent. See *Moore v. State Bank of Burden*, 240 Kan. 382, 389, 729 P.2d 1205 (1986), *cert. denied* 482 U.S. 906 (1987) (citing *DuShane v. Union Nat'l Bank*, 223 Kan. 755, 759, 576 P.2d 674 [1978]).

K.S.A. 16a-2-401(9)(b) calls the authorized origination fee a "nonrefundable, prepaid finance charge." None of the documents indicated, nor was Gonzales informed, that he had been charged an origination fee. Gonzales testified that he believed the stated prepaid finance charge was simply an interest payment, and if he had known he was required to pay $100 to obtain a relatively small amount of money, he would not have done so.

Gonzales argued that Associates' half-truths and its activities made the disclosures fraudulent. Gonzales alleged that Associates had a duty to disclose it was charging him an origination fee. Without this disclosure, Gonzales was not capable of understanding the effects of Associates' activities. Gonzales' active fraud claims revolve around the fact that Associates' pattern and practice was to encourage Gonzales (and all customers) to continuously refinance existing loans. These continuous refinancings provide Associates the opportunity to charge an additional $100 origination fee labeled a prepaid finance charge, improperly include the origination fee in the amount financed, and receive an incremental interest rate higher than allowed by law, which was not disclosed in any document.

Gonzales alleges this is fraud through silence. In support of this, Gonzales first points out Kansas law permits fraud through silence claims. I acknowledge that the party failing to disclose must have a legal or equitable duty to disclose in order for the claimant to state a valid claim for fraud through silence. Associates' duty to disclose is well stated in Restatement (Second) of Torts § 551 (2)(b), (c), and (e) (1977), which provides that a party has a duty to exercise reasonable care when

"(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and, . . .

"(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

. . . .
    "(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."

Gonzales asserts that the promissory notes are ambiguous; thus, the duty to exercise reasonable care under the Restatement exists between Associates, the lender, and Gonzales, the borrower.

Gonzales' assertion is supported by courts of other jurisdictions. In *Emery v. American General Finance, Inc.*, 71 F.3d 1343 (7th Cir. 1995), Chief Judge Posner, writing for a 2-1 majority, overturned the district court for granting a motion to dismiss on a fraud count in a situation similar to the one here. Emery borrowed money from American General Finance (AGF) and was making her payments on time. After approximately 6 months, AGF wrote her and told her it had more money for her if she wanted it. She did, and AGF refinanced her loan. In doing so, AGF gave Emery a check for $200 in addition to paying off her original loan. This extra $200 cost Emery about $1200 over the course of her loan. If she had simply taken out a new loan rather than refinancing her old one, it would have cost her considerably less—something AGF failed to disclose. Chief Judge Posner calculated that the interest imposed by AGF was something above 110 percent.

The majority also states that there is nothing fraudulent about calling an origination fee a prepaid finance charge. The majority notes that Regulation Z requires such, and K.S.A. 16a-2-401(9)(b) calls it a prepaid finance charge. The majority is correct in that K.S.A. 16a-2-401(9)(b) states an origination fee "shall be a nonrefundable, prepaid finance charge." However, it does not state that an origination fee shall be *called* a prepaid finance charge. Neither does Regulation Z require an origination fee to be called a prepaid finance charge. In fact, a reading of the definitions contained therein leads to the conclusion that the origination fee charged to refinance existing loans is not a prepaid finance charge under Regulation Z.

12 C.F.R. 226.2(23) (1998) provides:

"*Prepaid finance charge* means any finance charge paid separately in cash or by check before or at consummation of a transaction, or withheld from the proceeds of the credit at any time."

Gonzales neither prepaid an origination fee before or at consummation of the transaction. Nor was the origination fee withheld from the proceeds of credit extended to Gonzales. Associates improperly included the $100 prepaid origination fee in the amount loaned and then charged interest for the $100 loaned.

In *Noel v. Fleet Finance, Inc.*, 971 F. Supp. 1102 (E.D. Mich. 1997), a mortgage broker received a "yield spread premium" for soliciting mortgages on behalf of the lender. The lender passed this on to the buyers in the form of higher interest rates charged on the loan. Thus, there was no separately paid fee by the borrower before or at the consummation of the transaction. Rather, the premium was paid in the form of higher interest rates over the course of the loan. Plaintiffs sued defendants for a violation of the federal Truth-in-Lending Act (TILA) in that the yield premium was not disclosed as a prepaid finance charge. The *Noel* court dismissed this claim, pursuant to Fed. R. Civ. Proc. 12(b)(6), holding that the yield spread premium could not be considered a prepaid finance charge under Regulation Z because it was to be paid over the term of the loan rather than before or at the inception of the loan. 971 F. Supp. at 1112.

12 C.F.R. § 226.18 (1998) sets forth what information shall be disclosed by lenders. It requires a disclosure to state the amount financed. This figure is calculated by determining the principal loan amount, adding any other amounts financed, and subtracting the prepaid finance charge. A review of Associates' promissory notes indicates there was no subtraction of a prepaid finance charge as required by Regulation Z.

Subsection c of § 226.18 requires an itemization of the amount financed to include the amount of any proceeds distributed directly to the consumer, any amounts credited to the consumer's account, any amounts paid to another on behalf of the consumer, and the prepaid finance charge. While Associates discloses the prepaid finance charge in this section, it specifically states it is not part of

the "amount financed." Either the majority is wrong, or Associates did not comply with Regulation Z in its promissory notes.

In fact, when reviewing the promissory notes, it is not possible to determine how the prepaid finance charge (origination fee) is computed or how it is paid. Each note discloses the amount paid to Gonzales, the amount paid the insurance company, and the amount paid on Gonzales' old account. Adding up these amounts gives the "amount financed." Nowhere is the prepaid finance charge added in. Gonzales did not pay the fee in cash at the time of the transaction. It is not specifically included in the amount financed or the "total of payments." It is simply not possible for a borrower to ascertain how the origination fee is paid from the face of the promissory note.

Here, the origination fee is spread over the term of the loan. It is not prepaid by the debtor. Therefore, the "origination fee" is not a prepaid finance charge as that term is used in Regulation Z. Consequently, the majority's contention that Regulation Z requires lenders to call an "origination fee" that is included in the money loaned a "prepaid finance charge" is wrong.

There is no statutory requirement that an origination fee be called a prepaid finance charge. In fact, the definition of prepaid finance charge contained in Regulation Z seems to preclude its use for an origination fee as charged in this transaction. There is no good reason not to call the origination fee what it is. Whether Associates did not want its customers to understand they were continually being charged origination fees when they refinanced is a question of fact not subject to summary judgment.

Gonzales also claims that Associates' actions violate the KCPA. K.S.A. 50-626 of that Act provides, in part:

"(b) Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act, whether or not any consumer has in fact been misled:

. . . .

(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;

(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact."

Associates concealed the cost of refinancing, and the conceal-
ment was willful as evidenced by Associates' practice of soliciting
customers to refinance. Concealing origination fees and the higher
incremental expense of borrowing small amounts is a failure to
disclose the true loan balance and is deceptive behavior.

In defense of its actions, Associates claims it fully complied with
TILA requirements and thus its behavior cannot be deceptive. It
should be again noted that the origination fees contemplated by
state statute and defined by Regulation Z are not prepaid finance
charges added to a refinanced loan.

In *Manley v. Wichita Business College*, 237 Kan. 427, 701 P.2d
893 (1985), plaintiff brought TILA and KCPA claims against de-
fendant. Manley visited Wichita Business College in response to
an advertisement for a geologic drafting class. When talking to the
recruiter, whose title was "career counselor," Manley was told the
regular drafting course, which was 10 times more expensive, was
the much better course.

Wichita Business College challenged a jury verdict against it for
violation of the TILA and the KCPA. The *Manley* court noted that
Wichita Business College's acts in steering Manley towards the
more expensive course violated the Federal Trade Commission's
(FTC) regulation against bait-and-switch tactics found at 16 C.F.R.
§ 238.0 (1998). 237 Kan. at 436. Additionally, the court found the
titling of a recruiter as a career counselor violated another FTC
regulation prohibiting such designations. 237 Kan. at 433. The
*Manley* court found the jury verdict on the two KCPA counts to
be supported by the violation of the FTC regulations. 237 Kan. at
434, 437.

In *Weatherman v. Gary-Wheaton Bank*, 286 Ill. App. 3d 48, 676
N.E.2d 206 (1996), plaintiffs brought a class action against a bank
for failing to disclose it would charge a mortgage assignment fee.
The Illinois Appellate Court took the case on a certified question
as to whether this nondisclosure was a violation of the Illinois Con-
sumer Fraud and Deceptive Practices Act. The *Weatherman* court
first noted that the Real Estate Settlement Procedures Act
(RESPA), 12 U.S.C. § 2601 *et seq.* (1994), requires advance dis-
closure of settlement costs to home buyers. Defendant did not

disclose this fee in its RESPA disclosures. Instead, defendant made a "gross estimate" of anticipated settlement costs. 286 Ill. App. 3d at 57. Because the gross estimate concealed the *identity* of the fee, the *Weatherman* court found the RESPA violation to be deceptive. 286 Ill. App. 3d at 60.

*In re Tucker*, 74 Bankr. 923 (Bankr. E.D. Pa. 1987), is factually similar to this case. There, a debtor was charged a $100 service charge for borrowing money. This charge was permitted by statute and, similarly by statute, lenders were not required to refund it when the borrower refinanced or prepaid the loan. Because of the aforementioned statutes, the *Tucker* court did not make a determination that finance charges were usurious as a result of the failure to refund the service charge when the debtor refinanced. However, the court did state: "This ruling . . . does not foreclose a UDAP [unfair or deceptive acts or practices] claim challenging this practice on these or similar facts where it could be proven that unfair advantage was taken of unsophisticated borrowers." 74 Bankr. at 928.

Did the borrower understand the terms of the credit transaction? Was the borrower protected from unfair practices?

Associates did disclose that it was charging an additional $100 prepaid finance charge to refinance existing loans. It did not disclose that in fact this $100 fee was an origination fee for new loans of less than $500, nor did it explain how this fee was paid. The promissory note does not state that the origination fee was included in the note. This led Gonzales to believe that the origination fee was interest he paid in advance out of the proceeds of the loan. Whether this action taken by a seller was deceptive under the KCPA is a question for the trier of fact. The district court erred in ruling as a matter of law that defendant's conduct was not unconscionable under the UCCC. The majority was wrong to affirm the district court.